FLOYD J. VOIGHT AND MARION C. VOIGHT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FLOYD J. VOIGHT AND C. LORRAINE PERK VOIGHT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4565–74, 7014–75.  Filed April 27, 1977.

*Robert O. Rogers and David S. Meisel,* for the petitioners. *William H. Newton III,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax and an addition to tax as set forth below:

| Docket No. | Petitioners | Calendar year | Deficiency | Addition to tax, sec. 6651(a) |
|---|---|---|---|---|
| 4565–74 | Floyd J. Voight and Marion C. Voight. | 1968 | $204,017.48 | — |
| | | 1969 | 123,036.91 | — |
| 7014–75 | Floyd J. Voight and C. Lorraine Perk Voight | 1970 | 44,355.27 | $10,460.20 |
| | | 1971 | 7,450.48 | — |

Several issues raised by the pleadings have been disposed of by agreement of the parties. The only issue remaining for

decision is whether petitioners are entitled to report gain realized on the sale of real property in 1968 under the installment method provided in section 453, I.R.C. 1954.[1]

Some of the facts have been stipulated and are found accordingly.

Petitioners Floyd J. Voight and Marion C. Voight, husband and wife as of the end of calendar years 1968 and 1969, filed joint Federal income tax returns for those years with either the District Director, Internal Revenue Service, Milwaukee, Wis., or the Director, Internal Revenue Service Center, Kansas City, Mo. Petitioners Floyd J. Voight and C. Lorraine Perk Voight, husband and wife as of the end of calendar years 1970 and 1971, filed joint Federal income tax returns for those years with the Director, Internal Revenue Service Center, Chamblee, Ga.[2] At the time of filing the petitions in these cases, consolidated here for trial and opinion, all petitioners resided in Palm Beach, Fla.

In 1968, petitioner Floyd J. Voight owned certain real property and leasehold improvements in Madison, Wis. Most of this property was operated as a Holiday Inn motel, and the rest was land adjoining the motel. The leasehold improvements were constructed on land leased from a trust of which Mr. Voight's children were the beneficiaries. Prior to 1968, petitioner's property was owned by a corporation, HIM, Inc., of which petitioner was an officer.

In 1968, Mr. Voight determined to sell the Holiday Inn and the adjoining property (hereinafter referred to as the Holiday Inn property) in anticipation of his retirement and move to Florida. He found a buyer, Madison Motor Inn, Inc., a subsidiary of General Management Corp. However, he encountered some difficulty in arranging the sale. The property was subject to three mortgages held by First Federal Savings & Loan Association of Wisconsin (hereinafter referred to as First Federal) totaling $1,136,698.72 on October 1, 1968. Petitioner's adjusted basis in the property on October 1, 1968,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] The return for 1970 was filed with respondent on May 8, 1972.

was $625,696.22. Petitioner wanted to report the gain on the sale of the property under the installment method, and he believed that selling by means of a contract for deed was the only way that would allow him to do so in these circumstances.

On October 1, 1968, petitioners Floyd J. Voight and his then wife Marion C. Voight entered into an agreement with Madison Motor Inn, Inc. (Madison) and its parent, General Management Corp. (General), for the sale to Madison of the Holiday Inn property. This agreement, entitled "Installment Contract," is set forth in pertinent part below:

This agreement made as of the 1st day of October, 1968, by and between FLOYD J. VOIGHT, and MARION C. VOIGHT, his wife, hereinafter referred to in the singular as the Seller, and Madison Motor Inn, Incorporated, a Wisconsin corporation, Buyer,

WITNESSETH:

The Seller hereby agrees to sell, transfer and convey to the Buyer: (a) the improvements consisting of the motel, restaurant and bar comprising the business known as Holiday Inn #1 on East Washington Avenue, Madison, Dane County, Wisconsin, located upon the lands described in Exhibit A which is attached hereto; (b) the fee simple title to the land described in Exhibit B which is attached hereto; and (c) everything connected with or pertaining to such business excepting only accounts receivable and the personal property which HIM, Inc. is conveying to the party of the second part by a bill of sale of even date herewith, for the sum of one million two hundred fifty thousand dollars ($1,250,000.00) upon the terms and conditions hereinafter set forth:

1. *Payment.* The sum of thirty thousand dollars ($30,000.00) is paid upon the purchase price upon the execution hereof; and the balance of one million two hundred twenty thousand dollars ($1,220,000.00) shall be paid by the Buyer to the Seller in monthly installments in the following manner:

(a) The sum of one million one hundred thirty-six thousand six hundred ninety-eight and 72/100 dollars ($1,136,698.72) plus interest thereon from December 1, 1968, at the rate of seven per cent per annum shall be paid in monthly installments equal to the monthly installments of principal and interest on the obligation secured by the three mortgages of record in Dane County, Wisconsin Register of Deeds office as documents numbered 1068991, 1068992 and 1124926 and the amendments thereto, beginning on the first day of December, 1968, and continuing on the first day of each subsequent calendar month until said amount and all interest thereon is paid in full.

(b) The sum of eighty-three thousand three hundred one and 28/100 ($83,301.28) plus interest thereon at the rate of six and three-fourths per cent per annum from December 1, 1968, shall be paid in monthly installments of $734.50 beginning on the first day of December, 1968, and

continuing on the first day of each subsequent calendar month until said amount and all interest thereon is paid in full. The Buyer shall deduct from each payment under this paragraph 1/28 of the amount of interest payable on the same date under paragraph (a) above.

The buyer may make the payments first above mentioned to the holder or holders of the obligations to First Federal Savings and Loan Association of Wisconsin secured by the three mortgages of record in the Dane County, Wisconsin Register of Deeds Office as documents numbered 1068991, 1068992 and 1124926 and the amendments thereto, and such payments shall be deemed to have been made upon this contract. All payments on this contract shall be applied first to interest in advance for each month and then to principal.

2. Possession of the premises shall be given to the Buyer as of the beginning of October, 1968.

3. All taxes and assessments for the year 1968 and subsequent years shall be paid by the Buyer. The Buyer shall pay to the Seller to be held in trust for payment of installment payments, taxes and assessments in advance in amounts equal to those required of the Seller by said mortgages for taxes and assessments and may make such payments directly to the holder of said mortgages to be deposited in the Seller's escrow account with the holder of such mortgages. The Buyer shall keep such buildings and improvements in good condition and repair and insured in good licensed insurance companies against fire and extended coverage casualties in an amount at least equal to the balance unpaid hereunder with loss payable to the Seller as his interest may appear. The original or duplicate copies of the policy or policies shall be deposited with the Seller.

4. The Seller agrees that in case the aforesaid purchase price with the interest shall be fully paid and all the conditions herein provided shall be fully performed at the time and in the manner specified, the Seller will, on demand, thereafter cause to be executed to the Purchaser a good and sufficient warranty deed of the buildings and improvements above described and of the lands described in said Exhibit B free and clear of all liens and encumbrances excepting taxes and assessments for the year 1968 and subsequent years and any liens or encumbrances created by the act or default of the Buyer.

* * *

6. If any default on the part of the Buyer under this contract continues for thirty (30) days after written notice thereof has been given by the Seller to the Buyer, the Seller shall have the right to foreclose the rights of the Buyer, its successors and assigns, in the property which is subject to this contract by an equitable action of foreclosure or to obtain relief by an equitable action of specific performance or to recover any amounts due and owing hereunder by an action at law and may elect to have the entire amount unpaid on this contract to be immediately due and payable; but the Seller shall not have the right to terminate any of the rights of the Buyer, its successors and assigns in such property without the intervention of a court of equity; provided however, that if the default is other than one relating to payment of money and if reasonable efforts to cure such default are commenced within such thirty (30) day period and continue without

unreasonable interruption thereafter, the remedies provided hereunder shall not be invoked. In the event of such foreclosure or specific performance, title to all of the land described in said Exhibit A shall be deemed to be vested in the party acquiring title to the buildings and improvements and the judgment of foreclosure or specific performance shall so provide. The title to such land shall stand as security for the obligations of the Buyer under this contract. In case such court proceedings are justifiably instituted, reasonable attorneys' fees shall be added to the principal under this contract and become due as accrued.

Approval of the conveyance of the Holiday Inn property was sought from the mortgagee, First Federal, as required by the notes evidencing the mortgage indebtedness. By letter dated October 14, 1968, and addressed to General, First Federal agreed to give its consent subject to certain conditions. These conditions were substantially[3] incorporated in a document entitled "Mortgage Loan Amendment" executed by petitioners, Madison, General, HIM, Inc., First Federal, and certain other interested parties on November 15, 1968. The mortgage loan amendment was recorded in the Register of Deeds Office in Dane County, Wisc., on November 15, 1968. The body of this document is set forth in part below:

WITNESSETH:

WHEREAS, First Federal is the holder of three Mortgage Notes executed by HIM, VOIGHTS and MADISON BANK, * * *

WHEREAS, the Mortgages securing the first and second mortgage loans conveyed and encumbered the real estate hereinafter described, designated as Parcel A, and the Mortgage securing the third mortgage loan conveyed and encumbered the real estate hereinafter described, designated as Parcel A and Parcel B, to wit:
* * *

WHEREAS, the first and second mortgage loans were further secured by the real estate designated as Parcel B in the Mortgage securing the third mortgage loan by virtue of the terms and provisions of a Loan Amendment Agreement, dated March 1, 1965 by and between Madison Bank, HIM,

---

[3] One provision in the commitment letter from First Federal stated:

"The terms and provisions of the mortgage loan agreements and the mortgages securing the same, may be partially released, amended or modified with the approval of Holiday Inns of America, Inc. and all parties liable for the mortgage loan indebtedness, except HIM, INC., Floyd J. Voight and Marion C. Voight and Madison Bank & Trust Co., as Trustee."

This provision does not appear in the Mortgage Loan Amendment. However, some provisions for amendment of the loan agreements were made in the second paragraph of item 4 of the mortgage loan amendment, quoted above.

Voights and First Federal and recorded in said Register's Office on March 4, 1965 as Document No. 1125324; and

\* \* \*

WHEREAS, HIM and Voights have entered into an agreement with GMC for the sale and transfer of the improvements and personal property located upon the mortgaged premises presently owned by HIM and Voights to Madison Motor the interest acquired by said grantee being subject and subordinate to the lien of each of the mortgages securing said mortgage loans; and

WHEREAS, Madison Motor intends to acquire the real estate fee presently owned by Madison Bank, also subject to the lien of each of the Mortgages securing said mortgage loans; and

WHEREAS, each of the Mortgage Notes evidencing the mortgage loan indebtedness contains a provision as follows:

It is expressly understood and agreed, that this Mortgage Note shall become due and payable forthwith at the option of the Association if, at any time during this loan the Promissors and Mortgagors shall convey away said mortgaged premises or, if the title thereto shall become vested in any other person or persons in any manner whatsoever, unless the consent in writing of the Association herein, or its successors or assigns, is first obtained; and

WHEREAS, the approval and consent of First Federal has been requested for the transfer of ownership and conveyance of title from the present owners to Madison Motor and Madison Bank has requested to be released from any and all personal liability with reference to said mortgage loans:

Now, THEREFORE, in consideration of the premises and the mutual covenants, promises and agreements herein contained, it is hereby agreed by and between the parties hereto as follows:

1. First Federal does hereby consent to the transfer of ownership and conveyance of the title of the mortgaged premises to Madison Motor and agrees that said mortgage loans shall continue and remain in full force and effect except as hereinafter amended and modified and, further agrees that no transfer fee, discount or other charge shall be due First Federal by reason of said transfer or ownership and conveyance of title except for actual costs and expenses, including reasonable attorneys' fees, incurred by First Federal.

2. The mortgage loans shall be current and in good standing in all respects as of the present date. The interest rates on each of the mortgage loans shall be increased to 7% per annum, effective as of November 16, 1968 and the monthly installment payments or principal and interest shall be increased to the following amounts with reference to each of the mortgage loans: $7,145.00 as to the first mortgage loan; $1,724.00 as to the second mortgage loan and $2,939.00 as to the third mortgage loan, effective as of December 1, 1968. The provision in the Mortgage Notes evidencing the first two mortgage loans permitting First Federal to increase or decrease the interest rate at its option (escalator clause) is hereby deleted.

\* \* \*

4. Madison Motors, GMC and Bucksbaums, jointly and severally, absolutely guarantee to First Federal, its successors or assigns, the payment

of the amounts due and owing on each of said mortgage loans and agree to be bound by each and all of the terms and provisions contained in the mortgage loan agreements, except as herein amended and modified, all as though said agreements had originally been made and executed by each of them. The principal loan agreements consist of the following documents: Mortgage Note with reference to each mortgage loan, Mortgage with reference to each mortgage loan, Loan Amendment Agreement dated March 1, 1965, Partial Release of Mortgages dated March 24, 1966 with reference to each mortgage loan, Mortgage Amendment Agreement dated March 24, 1968, Loan Amendment Agreement dated February 24, 1967, Chattel Mortgage dated March 20, 1963 and Chattel Mortgage dated March 1, 1965 and Letter Agreement approving of change of ownership dated October 14, 1968.

The joint and several personal obligation of each of said parties shall terminate only upon First Federal receiving payment in full of the loan indebtedness due with reference to each of said mortgage loans. The said obligors further agree:

(a) To any extension of time of payment that may be granted by First Federal;

(b) To any reinstatement after default or defaults of any kind;

(c) To any modification or amendment which does not materially or substantially alter the obligations of the parties.

The guarantors waive notice of acceptance of this guarantee by First Federal. All rights, powers and other remedies of First Federal herein contained shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to First Federal by law. No exercise, delay in exercise or omission to exercise any right, power or remedy shall be deemed a waiver thereof. All reasonable attorneys' fees, court costs and expenses incurred by First Federal in the enforcement of the within guarantee of absolute payment shall be borne by said guarantors.

In the event of default of any payment due on the mortgage loans, written notice of such default shall be given by First Federal to GMC and ten days granted to GMC to cure such default. Notice of default as to any other defaults, other than non-payment or default permitting Holiday Inns of America, Inc. to cancel the license agreement for operation of the Holiday Inn on the mortgaged premises, shall be given by First Federal to GMC with thirty days granted to cure such defaults. Such notice shall be effective upon mailing and shall be given to GMC at the address last shown by First Federal's records.

\* \* \*

6. The mortgages securing each of the mortgage loans shall remain and continue to be first and paramount liens and encumbrances on the mortgaged premise hereinbefore described, which shall remain and continue to be subject to the lien, charge or encumbrance of each of said Mortgages and, nothing herein contained or done pursuant hereto shall effect or be construed to effect the liens, charges or encumbrances of said

Mortgages or the priority thereof over other liens, charges or encumbrances.

Madison also purchased the land on which petitioner's leasehold improvements were constructed from Madison Bank & Trust Co., the trustee that held the land. A trustee's deed reciting consideration of $90,000 was executed and recorded on November 15, 1968. The conveyance was expressly made "subject to mortgages" held by First Federal and "subject to the rights of Floyd J. Voight as owner of the building and improvements on said land."

On November 14, 1969, petitioners Floyd J. Voight and Marion C. Voight and a trust named Floyd J. Voight Estate conveyed a separate tract of land adjoining and lying northeast of the properties subject to the installment contract executed October 1, 1968, to Madison by warranty deed. The conveyance was expressly made subject to one of the mortgages held by First Federal and to several loan amendment agreements, including the one executed on November 15, 1968, previously described.

Since December of 1968, all payments on the mortgages held by First Federal have been made by checks drawn by Madison or General payable directly to First Federal. No payments on the mortgages have been made by petitioners. On December 3, 1968, General sent the following memorandum to First Federal:

We have received monthly statements covering loans #012553B and #012553C, but have not received one for loan #012553A in amount of $2,482.00. Will you please send all future statements for the Madison Motor Inn, Inc. to the following address:

> General Management Corp.
> P. O. Box 1536
> Des Moines, Iowa 50306

We are enclosing our check #12572 covering all 3 subject loan payments, including Taxes-$4,814.40 and Insurance-417.60.

Petitioner Floyd J. Voight received cash payments of $35,814.95 during 1968 from General or Madison pursuant to the "Installment Contract." No part of these receipts was a payment in respect of the mortgages held by First Federal. The property subject to the installment contract executed October 1, 1968, has never been conveyed by deed from petitioners to Madison or to General.

In their Federal income tax return for 1968, petitioners Floyd J. Voight and Marion C. Voight reported a gain of $17,885.98 from the sale of the Holiday Inn property. They explained their computation in the following manner in their return:

*Gain on Sale of Holiday Inn #1*

Date of sale: October 1, 1968

| | | |
|---|---:|---:|
| Sales price | | $1,250,000.00 |
| Cost of property sold: | | |
| Lot | $33,192.61 | |
| Building—acquired 1959 ...... $847,082.12 | | |
| Allowance for depreciation ......... (353,540.63) | | |
| | 493,541.49 | |
| Cabana units ...... 124,205.14 | | |
| Allowance for depreciation ......... (25,243.02) | | |
| | 98,962.12 | |
| | | 625,696.22 |
| Total gain realized | | 624,303.78 |

Taxpayer hereby elects to report this gain under the installment provisions of Section 453 of the Internal Revenue Code.

| | |
|---|---:|
| Collections in year of sale | $35,814.95 |
| Gross profit percentage | 49.94 |
| Total gain realized in 1968 | 17,885.98 |

These petitioners reported a $33,794.58 gain from the sale of the Holiday Inn property on their Federal income tax return for 1969, calculated by applying this gross profit percentage of 49.94 percent to receipts of $67,670.36. Petitioners Floyd J. Voight and C. Lorraine Perk Voight reported gains of $27,632.12 and $27,655.91 on their Federal income tax returns for 1970 and 1971, respectively, calculated by applying this gross profit percentage of 49.94 percent to receipts of $55,330.64 and $55,378.27, respectively.

In his notice of deficiency to petitioners Floyd J. Voight and Marion C. Voight, respondent determined that petitioners were not entitled to report gain on sale of the Holiday Inn property under section 453 because they received in excess of 30 percent of the selling price of the property in the year of sale. He therefore increased the gain taxable to petitioners in 1968 on the sale to $623,078.18, the full amount of gain that respondent determined was realized by petitioners. Also, respondent reduced the capital gain reported by petitioners in

1969 by \$33,794.58, the amount they reported as gain recognized from sale of the Holiday Inn property. The notice of deficiency to petitioners Floyd J. Voight and C. Lorraine Perk Voight, however, does not clearly show whether respondent made adjustments in determining these petitioners' tax liability for 1970 and 1971 to eliminate the amounts reported as gain from the sale of the Holiday Inn property.

OPINION

Petitioners sold real property in 1968 under a contract providing for payment to be made in monthly installments over a period of several years and providing for title to be delivered at the end of that period. Petitioners elected to report the gain realized on this sale under the installment method provided by section 453(b). The controversy here arises from the fact that at the time of the sale the property was encumbered by three mortgages the unpaid balances of which exceeded petitioners' adjusted basis in the property.

Section 453(a)[4] provides that certain sellers of personal property on the installment plan may return as income from the sale of such property in any year the proportion of the payments actually received in that year that the gross profit on the sale bears to the total contract price. This treatment is extended to sales of real property in section 453(b)[5] if any

---

[4] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(2) TOTAL CONTRACT PRICE.—For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. This paragraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph (1).

[5] SEC. 453 (b). SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding \$1,000,

payments in the year of sale do not exceed 30 percent of the selling price. The parties here disagree over whether petitioners received payments in the year of sale exceeding this 30-percent limitation. Petitioners assert that the only payments received were cash payments totaling $35,814.95. Respondent determined that, in addition to these cash payments, petitioners received a payment in the year of sale equal to the excess of the mortgages over the adjusted basis of the property, an amount equal to $511,002.50.

Although section 453 does not expressly provide any special treatment for sales of mortgaged property, respondent's regulations provide in part:

(c) *Determination of "selling price"*. In the sale of mortgaged property the amount of the mortgage, *whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser,* shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and *for the purpose of determining the payments* and the total contract price as those terms are used in section 453, and sections 1.453–1 through 1.453–7, *the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property.* The term "payments" does not include amounts received by the vendor in the year of sale from the disposition to a third person of notes given by the vendee as part of the purchase price which are due and payable in subsequent years. Commissions and other selling expenses paid or incurred by the vendor shall not reduce the amount of the payments, the total contract price, or the selling price. [Sec. 1.453–4(c), Income Tax Regs. Emphasis added.]

Respondent's regulation is not applicable to all sales of mortgaged property, however. By its terms, it applies only where the mortgage is assumed or where property is taken

---

may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply only if in the taxable year of the sale or other disposition—

(A) there are no payments, or

(B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

(3) PURCHASER EVIDENCES OF INDEBTEDNESS PAYABLE ON DEMAND OR READILY TRADABLE.—In applying this subsection, a bond or other evidence of indebtedness which is payable on demand, or which is issued by a corporation or a government or political subdivision thereof (A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or (B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market, shall not be treated as an evidence of indebtedness of the purchaser.

subject to the mortgage. *Stonecrest Corp. v. Commissioner,* 24 T.C. 659, 666 (1955). See also *Estate of Lamberth v. Commissioner,* 31 T.C. 302, 314 (1958); *United Pacific Corp. v. Commissioner,* 39 T.C. 721 (1963).

In *Stonecrest Corp. v. Commissioner, supra,* this Court held that the expressions used in the regulation, "property is merely taken subject to the mortgage" and "mortgage is assumed by the purchaser," have the meanings customarily attributed to them in transactions involving transfer of mortgaged property. We noted at page 668 that "While in a sense every sale of mortgaged property is subject to a mortgage since the property remains liable to have the mortgage debt satisfied from it, we think the expression was used in the regulation in its customary meaning, to define the obligations of the parties to a sale of property with respect to the mortgage debt." The Court stated its understanding of the customary meanings of the expressions in the following language (p. 666):

Taking property subject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obliged to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property. Where a buyer assumes a mortgage on property, he pays the seller for the latter's redemption interest, and in addition promises the seller to pay off the mortgage debt. This promise of the buyer can ordinarily be enforced by the mortgagee. * * *

Respondent has not argued that the interpretation of the regulation in *Stonecrest* is incorrect, but asserts that either the mortgages here were assumed or the purchaser took the property subject to them within the meaning of the regulation. Petitioners argue the opposite position.

In *Stonecrest,* as here, the petitioner sold its property under an installment sales contract. We held on the facts there before us that such a sale did not fall within the meanings customarily given the expressions in the regulation. Specifically, there was no assumption of the mortgage because the buyer had no obligation to the mortgagor to pay the mortgage. The fact that the ultimate use of the buyer's payments was to

pay off the mortgage was not deemed a determining factor. Also, the property was not taken subject to the mortgage because the seller was obligated to the buyer to make payments on the mortgage.

In spite of the similarities between the sale in *Stonecrest* and the sale here, respondent contends that there are significant differences that should lead to the opposite result here. In *Stonecrest*, the contracts required the buyers to make all payments directly to the seller, including that portion expressly attributable to the mortgage payments that the seller was obligated to make to the mortgagee. Here, the buyer was permitted to make the portion of the payments attributable to the seller's mortgage payments directly to the mortgagee and to treat that amount as a payment to the seller under the sales contract. The buyer here exercised this option and made all such payments directly to First Federal. Also, the purchaser here executed an agreement to which petitioners and the mortgagee were parties. The purchaser and certain related parties "absolutely guarantee[d] to First Federal * * * the payment of the amounts due" on the mortgages, and they "agree[d] to be bound by each and all of the terms and provisions contained in the mortgage loan agreements, except as [modified by this agreement], all as though said agreements had originally been made and executed by each of them." Although the purchasers in *Stonecrest* executed a "purchaser's guarantee" of the seller's loan for the benefit of the mortgagee, it is not stated in the opinion what that "guarantee" was or precisely what rights and duties it created. The opinion does indicate that the seller remained primarily liable to the mortgagee, however.[6]

Petitioners assert that, while differences do exist, the essential characteristics of their transaction are identical to those in *Stonecrest*, relying on the descriptions given in that case of the regulation's expressions. In effect, petitioners ask

---

[6] Respondent also urges this Court to give weight to language in the mortgage loan amendment which described the interest acquired by the purchaser as "being subject and subordinate to the lien of each of the mortgages securing said mortgage loans." This language does not support respondent, however. It is merely an acknowledgment that the sale is of property subject to the mortgage in the sense that all sales of mortgaged property are subject and subordinate to the existing prior lien created by the mortgage. This Court expressly rejected this characteristic as a determinative factor under the regulation in *Stonecrest Corp. v. Commissioner, supra* at 668.

us to examine only certain elements of their transaction and to compare them, on a superficial level, to the characteristics described in *Stonecrest*. We are not persuaded to follow petitioners' approach since it would require us to make an unnecessarily formalistic and shortsighted analysis of the transaction and would do injustice to the established purpose of the regulation. Petitioners' transaction must be viewed as a whole to determine if it would be considered an assumption or a taking of property subject to the mortgage, as those terms are customarily understood. Based on our analysis, we agree with respondent that the factual differences between *Stonecrest* and the instant case warrant a different result and find on this record that the purchaser from petitioners assumed the First Federal mortgages within the meaning of section 1.453–4(c), Income Tax Regs.

Respondent argues that the provisions of the mortgage loan agreement and contract between petitioners and Madison and General considered together constitute an express assumption of the mortgages by the purchaser. Respondent stresses the statement in the mortgage loan agreement that Madison and General expressly agree "to be bound by each and all of the terms and provisions contained in the mortgage loan agreements * * * all as though said agreements had originally been made and executed by each of them." He stresses the provisions of the agreement between petitioners and Madison and General that the purchaser will pay the monthly installments on the mortgage loans and that these payments may be made directly to the mortgagee, First Federal.

In our view, we need not decide whether under State law the provisions of these documents, considered as a whole, result in a technical assumption of the mortgages by the purchaser. We have previously held that the absence of a formal promise to assume the mortgage in the documents executed does not negate the existence of an assumption when all the facts and circumstances surrounding the transaction show an intent of the parties that the mortgage be assumed by the purchaser. *Waldrep v. Commissioner*, 52 T.C. 640, 646 (1969), affd. 428 F.2d 1216 (5th Cir. 1970).

While petitioners labeled their transaction an installment sale and consciously avoided giving it the form of an

assumption, the actual and intended relationships created among the parties undermine the form employed.

From the mortgage loan amendment, we find that the purchaser, Madison, was obligated directly to the mortgagee, First Federal, for the mortgage indebtedness. The word "guarantee," defining an obligation, is by itself ambiguous, and its use requires an examination of its context to determine its meaning.[7] See *Mann v. Erie Mfg. Co.*, 19 Wis.2d 455, 120 N.W.2d 711 (1963). However, even construing the obligations created by its use in the mortgage loan amendment most favorably for petitioners, the purchaser was a guarantor of payment and the mortgagee could bring an action directly against him on default of any mortgage payments. And importantly, no prior efforts at collection from the seller would be necessary. See *Swift & Co. v. Geraghty*, 199 Wis. 329, 226 N.W. 381 (1929); *United States v. Klebe Tool & Die Co.*, 5 Wis.2d 392, 92 N.W.2d 868 (1958). Such a personal obligation on the purchaser to pay the mortgage debt is consistent with an assumption by the purchaser.

Regardless of this obligation, however, petitioners assert that their transaction did not involve an assumption because Madison made no promise to pay the mortgage enforceable by petitioners. By this assertion, petitioners seek to elevate the form of their transaction over its substance. There is no question that Madison was obligated to petitioners to make payments equal to the mortgage payments. It is also clear that Madison was directly liable to the mortgagee if the mortgage payments were not made. These obligations, coupled with the factor of direct payment to the mortgagee, supply the element of assumption that petitioners deny exists. We find that, not only was Madison permitted to make direct payment to the mortgagee, it was intended by all parties that it would do so. The mortgagee sent statements directly to Madison or its parent corporation and looked to Madison as the principal

---

[7] Respondent and petitioners have argued at some length over whether the obligations of Madison should be labeled primary or secondary under Wisconsin law. The irrelevance of this question is highlighted by the fact that the cases of that jurisdiction use these terms in seemingly inconsistent ways when dealing with the same type of obligation. Compare *Swift & Co. v. Geraghty*, 199 Wis. 329, 226 N.W. 381 (1929), with *Continental Bank & Trust Co. v. Akawa*, 58 Wis.2d 376, 206 N.W.2d 174 (1973). The relevant issue is not whether the obligations are to be labeled secondary or primary, but whether they are those customarily associated with an assumption.

source of payment. All payments were in fact made directly to the mortgagee by Madison or its parent. Any argument that petitioners or Madison intended otherwise strains belief. Madison not only risked the mortgagee's lien on the property but also direct personal liability to the mortgagee if the mortgage were not paid. We find on this record that petitioners' right under their contract to compel payment of the amounts attributable to the mortgage was tantamount to a right to compel Madison to pay the mortgage and that Madison's obligation under the contract was in effect an obligation to pay the mortgage itself, not the contract payments.

While the transaction before this Court was not an assumption in form, we have found that all elements of an assumption, as that term is customarily understood, were present either in the express agreements or implied understandings of the parties. The sellers had a right to receive only the amount of their equity or redemption interest, the buyer was obligated to both the seller and the mortgagee to pay the mortgage payments, and the mortgage payments were in fact made directly to the mortgagee by the buyer. On this basis, Madison assumed the First Federal mortgages within the meaning of respondent's regulation.[8] Therefore, petitioners must include in payments in the year of sale the excess of the mortgage balances over their adjusted basis in the property. Because this amount exceeds 30 percent of the selling price of the property, petitioners are not entitled to use

---

[8] A contrary holding in this case would offend the purpose of the regulation that we here apply. Upholding the application of the corresponding regulation under the Revenue Act of 1926 in *Burnet v. S&L Building Corp.*, 288 U.S. 406 (1933), the Supreme Court held that the regulation was intended "to place a reasonable limitation upon the spread of the tax." The Court was especially sensitive to the problems that arose because the excess of the mortgage over the basis "would never actually come into the vendor's hands." Here, as in the case of an ordinary assumption, no part of the amounts in satisfaction of the mortgage would ever actually be received by the seller. See *Kirschenmann v. Commissioner*, 57 T.C. 524, 527–529 (1972), revd. on other grounds 488 F.2d 270 (9th Cir. 1973).

the installment method of reporting their gain under section 453.[9]

> *Decisions will be entered under Rule 155.*

---

[9] Adjustments if necessary may be made in the Rule 155 computations to exclude from gross income of petitioners Floyd J. and C. Lorraine Perk Voight the gain from the sale of the Holiday Inn property reported in the years 1970 and 1971.