* UNITED PACIFIC CORPORATION AND CONSOLIDATED SUBSIDIARIES, UNITED PACIFIC INSURANCE COMPANY, PACIFIC NORTHWEST COMPANY, UNITED GENERAL COMPANY, FERRIS & HARDGROVE, INC., UNITED NATIONAL CORPORATION, AND CASCADE INSURANCE COMPANY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85954. Filed January 29, 1963.

*George W. McBroom, Esq.*, for the petitioners.
*Norman H. McNeil, Esq.*, for the respondent.

[2] The record shows Charles Gilfillan was too ill to testify.
* By order of the Court dated May 28, 1963, the name of Cascade Insurance Company was stricken.

MULRONEY, *Judge:* The respondent determined a deficiency in petitioners' income tax for the year 1955 in the amount of $38,469.08. The sole issue is whether, in determining whether petitioners received payments in the year of sale of mortgaged real property in excess of 30 percent of the selling price within the meaning of the installment sale provisions, the excess of the mortgage over petitioners' adjusted basis in the property is to be included in the payments.

All of the facts have been stipulated and they are so found.

United Pacific Corp. is a holding company incorporated in the State of Washington. Among its subsidiaries is United Pacific Insurance Co., hereinafter called petitioner. United Pacific Corp. and its subsidiaries filed a Federal corporation income tax return for the year 1955 on a consolidated basis with the district director of internal revenue at Tacoma, Wash.

Petitioner was incorporated as a Washington corporation in 1928 and commenced business in that same year. Its home office is located in Tacoma, Wash. On December 2, 1941, petitioner acquired the Medical Arts Building, a 16-story, concrete-reinforced office building, and immediately prior to April 29, 1955, the building was owned by petitioner free of any mortgage or other secured indebtedness. On April 29, 1955, the petitioner executed a mortgage on the Medical Arts Building property to Equitable Life Assurance Society of the United States (hereinafter called Equitable) to secure payment of a note in the amount of $1,250,000. The mortgage provided that the "exclusive remedy of the mortgagee for breach of any term, condition or covenant in this mortgage, or for non-payment of the note for which this mortgage is given as security or any installment thereof shall be foreclosure of the property herein described and in the event of such foreclosure, the mortgagee shall not be entitled to a deficiency judgment against the mortgagor."

Periodically, before the execution of this mortgage, petitioner had been approached by real estate agents and brokers who inquired whether petitioner desired to sell the building. At the time of making the Equitable loan it was determined by the petitioner's executive committee that the petitioner would lose approximately $17,138 in projected annual net income, after taxes, if it sold the property for $1,650,000 but would gain approximately $16,750 in annual income if it obtained a loan upon the building. For this reason the petitioner abandoned any thought of selling the building, and the loan from Equitable was consummated on April 29, 1955. The loan was repayable over a 20-year period with interest at the rate of 4½ percent.

After consummation of the Equitable loan the petitioner continued to receive inquiries about the building from real estate men. During

the course of the Equitable loan negotiation the petitioner had been impressed by the high market value of $1,750,000 placed upon the building by Equitable, an amount never previously considered by petitioner as realistic. Thereafter, in response to inquiries by real estate men, petitioner stated that the price for the building was $1,750,000. In order to cut short the activities of real estate brokers and agents, the petitioner's executive committee resolved on June 27, 1955, that unless a sale was made at this price prior to August 1, 1955, the property would be removed from the market in the sense that no further inquiries of real estate men would be entertained. During the period of June and July, specific consolidated offers by various persons to purchase the property at a lesser price were refused.

On or about the last week in July or the first week in August the petitioner was approached for the first time by persons representing a group of investors (which later became the Medical Arts Building of Tacoma, Inc.) with an offer to purchase the building at the net figure of $1,706,000. On August 12, 1955, the petitioner executed an earnest money agreement to sell the Medical Arts Building for $1,706,000. The agreement provided, in part, as follows:

The property is to be conveyed by contract for deed, free of encumbrances except: none, except mortgage to Equitable Life Assurance Society of the United States in the original principal amount of $1,250,000.00, payable $23,787.00 quarterly beginning Sept. 1, 1955, with interest at 4½%, which mortgage purchaser will assume and agree to pay according to its terms at time of delivery of deed to purchaser. * * *

In accordance with the earnest money agreement, the sale to the Medical Arts Building of Tacoma, Inc., was closed on November 14, 1955, and the real estate contract provided, in part, as follows:

The terms and conditions of this contract are as follows:

The purchase price is One Million Seven Hundred Six Thousand Dollars ($1,706,000.00), of which Two Hundred Six Thousand Dollars ($206,000.00) has been paid, the receipt whereof is hereby acknowledged, and the balance of said purchase price, including interest computed monthly on deferred balances, at the rate of four and one-half per cent (4½%) per annum, shall be paid as follows:

Eight Thousand Two Hundred ($8,200.00) Dollars, or more, on January 1, 1956, and a like payment on the first day of each month thereafter for the next nineteen (19) months; and Ten Thousand Seven Hundred ($10,700.00) Dollars, or more, on the first day of each succeeding month beginning September 1, 1957, and for thirty-nine (39) months thereafter; in addition to the foregoing payments purchaser shall pay to the seller the sum of Fifty Thousand ($50,000.00) Dollars on or before May 15, 1956; and on or before November 15, 1960, shall pay the balance of seller's equity in said property down to the mortgage balance then due to The Equitable Life Assurance Society of the United States under the terms of a certain mortgage dated April 29, 1955, executed by the seller herein as mortgagor, and recorded May 3, 1955, in Book 786 of Mortgages, Page 773, Records of Pierce County.

Seller agrees to pay the installments on said mortgage as and when the same become due, but shall not make any advance payments thereon, until such time as seller's equity shall have been paid in full, at which time seller shall convey said real estate subject to balance then owing on such mortgage, which the purchaser will at that time assume and agree to pay according to its terms.

\*       \*       \*       \*       \*       \*       \*

The seller agrees, on full payment of said purchase price in manner hereinbefore specified, to make, execute, and deliver to the purchaser a good and sufficient warranty deed of said described premises as of November 15, 1955, but subject to the rights of tenants in possession and leases in effect and to the state of facts shown on the survey by L. A. Nicholson and Sons dated March 25, 1955, and if purchaser assumes the aforesaid mortgage, then subject also to said mortgage.

Petitioner made all the payments due under the mortgage up to November 15, 1960, at which time the purchaser assumed and agreed to pay the remaining mortgage balance. The amount which the purchaser assumed and agreed to pay was $1,012,888.32, as evidenced by a statement made by Equitable to petitioner in a letter dated May 22, 1959. Until the date of assumption of its mortgage by the purchaser, Equitable carried petitioner on its books as a debtor under the mortgage loan, and not until after November 15, 1960, did Equitable's books and records show the purchaser as the payor of the loan.

Of the total purchase price of $1,706,000 the petitioner received at the closing in 1955 the amount of $206,000, which cash amount represented all disbursements of purchaser in respect to the transaction during the year 1955. On November 14, 1955, the date of sale, the principal unpaid balance on the Equitable mortgage note was $1,233,719.56, and as of that date the petitioner's adjusted basis in the building, for the purpose of computing gain on the transaction, was $712,482.75.

On November 15, 1960, the purchaser paid the then remaining balance owing under the real estate contract. Petitioner's total profit on the transaction was $991,240, and the total Federal income tax payable by petitioner on the transaction was $241,234. Petitioner has reported and paid all of this tax on the installment basis during the period from 1955 through 1960, as per the following stipulation:

| (a) Calendar year | (b) Amount received under contract | (c) Profit reported (58.10317 percent of (b)) | (d) Tax paid |
|---|---|---|---|
| 1955 | $206,000.00 | $119,692.53 | $29,923.13 |
| 1956 | 79,835.25 | 46,386.81 | 11,596.70 |
| 1957 | 45,269.35 | 26,302.93 | (¹) |
| 1958 | 67,919.17 | 39,463.19 | 9,865.80 |
| 1959 | 91,341.63 | 53,072.38 | 13,268.10 |
| 1960 | 1,215,634.60 | 706,322.16 | 176,580.54 |
| Total | 1,706,000.00 | 991,240.00 | 241,234.27 |

¹ Loss year.

The United Pacific Corp., in the consolidated return filed for 1955 for the consolidated group, reported the sale of the Medical Arts Building by petitioner on the installment method, as follows:

| | |
|---|---:|
| Gross sales price | $1, 706, 000. 00 |
| Net sales price | 1, 703, 722. 75 |
| Adjusted basis | 712, 482. 75 |
| Gain on sale | 991, 240. 00 |
| Profit ratio (991,240 divided by 1,706,000) | 58. 10317% |
| Initial payment | 206, 000. 00 |
| Ratio of initial payment to selling price | 12. 07503% |
| Payments during 1955 | 206, 000. 00 |
| Profit realized during 1955 (58.10317×$206,000) | 119, 692. 52 |

Among other adjustments in the statutory notice of deficiency for 1955 the respondent determined that the installment method was not applicable for the purpose of reporting gain on the sale of the Medical Arts Building since amounts received by petitioner, including the excess of mortgage liability over the basis of the property, exceeded the 30-percent limitation provided by section 453 of the Internal Revenue Code of 1954.[1] The statutory notice stated that "Accordingly, the entire amount of the gain, $991,240.00, is included in the net long-term capital gains for the year 1955. This adjustment adds to reported income the difference between the reported amount of $119,692.53 and the total capital gain of $991,240.00."

Sections 453 (a) and (b)[2] provide that income from the sale or other disposition of real property may be reported on the installment method, but only if in the year of sale or other disposition there are (1) no payments or (2) the payments (exclusive of evidences of in-

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

[2] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

debtedness of the purchaser) do not exceed 30 percent of the selling price. Section 1.453–4(c), Income Tax Regs., provides as follows:

(c) *Determination of "selling price"*. In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and §§ 1.453–1 through 1.453–7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. * * * [3]

A substantially similar regulation was approved by the Supreme Court in *Burnet* v. *S. & L. Building Corporation*, 228 U.S. 406.

The dispute between the parties here involves the scope of the respondent's regulation quoted above. Respondent would have the regulation cover *every* sale of mortgaged property, or, as he states his position on brief, "in the case of a sale of excess mortgaged realty, regardless of whether the purchaser technically takes the property subject to or assumes the obligation to pay the mortgage, the excess of the mortgage over the adjusted basis of the property is a payment in the year of sale, as provided by the language of 1954 Regulations, section 1.453–4." Respondent then computes the payments received by petitioner in the year of sale as more than 30 percent of the selling price, as follows:

| | |
|---|---|
| Cash downpayment, Aug. 10, 1955 | $206,000.00 |
| Excess of mortgage over basis: | |
| Mortgage | 1,250,000.00 |
| Adjusted basis | 712,482.75 |
| Excess of mortgage over basis | 537,517.25 |
| Total payments | 743,517.25 |

$$\text{Total payments} \quad \frac{\$743,517.25}{1,706,000.00} = 43.582\%$$

---

[3] The purpose of the regulation is explained in *Stonecrest Corporation*, 24 T.C. 659, 665, as follows:

"In the case of real property sold on the installment plan where there was a mortgage on the property which the buyer either assumed or took the property subject to, the statutory scheme of returning a portion of each payment as income in the year received did not reach all of the seller's profit, since the total amount of the selling price was not paid over by the buyer to the seller; that portion of the selling price represented by the mortgage was paid by the buyer directly to the mortgagee. To remedy this, regulations were issued by the Commissioner and approved by the Secretary of the Treasury to provide that the amount of the mortgage, to the extent that it did not exceed the seller's basis in the property sold, was not to be considered a part of the 'initial payments' or of the 'total contract price.' Treasury Regulations 69, article 44, promulgated August 28, 1926; amended by Treasury Decision 4255, VIII–1 C.B. 165 (1929). The reduction in the total contract price had the effect of increasing the percentage of each installment payment to be returned as income, thereby reaching the entire profit on the sale. The amount by which the mortgage exceeded the seller's basis in the property was treated as a part of the initial payments and was added to the seller's basis in computing total contract price. * * *"

Respondent is here advancing an interpretation of section 1.453-4 (c), Income Tax Regs., which we have rejected in two prior cases involving a similar regulation under section 44 of the Internal Revenue Code of 1939, which is the predecessor of section 453. In *Stonecrest Corporation*, 24 T.C. 659 (appeal (C.A. 9) dismissed), the purchaser of mortgaged real property agreed to make payments on the purchase price for a period of years, after which the seller was to convey the property to the purchaser and the purchaser was to take over the remaining mortgage payments. The mortgage on the property exceeded the seller's basis in such property. We held that under those facts "There was no present assumption of the mortgage nor was the property taken subject to the mortgage, as those expressions are customarily used," and that, consequently, respondent "erred in including the excess of the mortgage over the seller's basis in initial payments." We also noted in the *Stonecrest* case that "By his interpretation respondent would extend the application of the regulation to every sale of property that has a mortgage on it." The *Stonecrest* case was followed, on this issue, in *Estate of E. P. Lamberth*, 31 T.C. 302.

We find the *Stonecrest* and *Estate of E. P. Lamberth* cases indistinguishable from this case. Stipulated facts show clearly that the purchaser agreed to pay $206,000 cash in the year of sale, then make monthly payments for a period of about 5 years, at which time the purchaser agreed to "assume and * * * pay [the mortgage] according to its terms."

Respondent contends that both the *Stonecrest* and the *Estate of E. P. Lamberth* cases were wrongly decided on this issue and urges that we reconsider these opinions. Respondent's arguments in support of his interpretation of the regulation are, for the most part, answered in the *Stonecrest* case, with which we are fully in accord. Nor does respondent offer any new argument on brief which would suggest that the result reached in the *Stonecrest* case was incorrect.

It is stipulated that petitioner reported the full profit of $991,240 on the sale over the 5-year period 1955-60, and the fact that petitioner paid no tax on the profit reported in 1957 is purely fortuitous, since that year was a loss year, and can have no bearing upon the controversy before us. Obviously, the exclusion from initial payments in the year of sale of the excess mortgage over the seller's basis does not prevent respondent from reaching all the profit on the sale. We cannot see how the interpretation given to the regulation in the *Stonecrest* case fails to give effect to the purpose of section 453, which is to enable a seller to distribute the profit on an installment sale over the years in which he actually received payments of the purchase price. In fact, respondent's interpretation would appear to be contrary to the statutory purpose, since in this case it would mean that

petitioner's entire profit of $991,240 on the sale of its mortgaged property would be taxable in the year of sale, when petitioner received a cash payment of $206,000, even though it was to receive payments on the purchase price for 5 years, at which time the property would be conveyed and the purchaser would assume and pay the balance of the mortgage.

Respondent argues that "the purchaser can realistically be regarded as having assumed the mortgage on the property at the time of the sale for Federal tax purposes regardless of recitals in the agreements." In the absence of any compelling reasons, we cannot accept this invitation to "realism" which involves a distortion of the agreement of the parties, and which also ignores the established distinctions in real property law in this area which were pointed out in the *Stonecrest* case.[4]

We hold for petitioners on this issue.

*Decision will be entered under Rule 50.*