D. A. HUNT AND ESTATE OF ALTHA HUNT (D. A. HUNT, SURVIVING SPOUSE), ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10890–78, 10912–78, 10913–78.     Filed June 27, 1983.

---

[1]Cases of the following petitioners are consolidated herewith: Dewey A. Hunt, Jr., and Marian C. Hunt, docket No. 10912–78; and William J. Hunt and Betty J. Hunt, docket No. 10913–78.

*Guy W. Johnson*, for the petitioners.
*Thomas G. Potts*, for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal individual income tax against petitioners as follows:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| 10890–78 | D. A. Hunt and Estate of Altha Hunt (D. A. Hunt, surviving spouse) | 1973 | $7,941.89 |
| 10912–78 | Dewey A. Hunt, Jr., and Marian C. Hunt | 1973 | 12,267.85 |
| 10913–78 | William J. Hunt and Betty J. Hunt | 1973 1974 | 12,678.42 1,244.67 |

These cases have been consolidated for trial, briefs, and opinion. After concessions by petitioners,[2] the issue for decision is whether, under section 453 on the sale of an apartment complex, (1) the amount by which each petitioner-husband's share of the outstanding indebtedness on the apartment complex exceeds his adjusted basis therein constitutes payment received in the year of sale, and (2) the amount of this indebtedness is included in the total contract price only to the extent of this excess.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

---

[2] Petitioners have made concessions regarding the application of secs. 1245 and 1250. Petitioners have not disputed certain allocations by respondent in the notices of deficiency among sec. 1245 property, sec. 1250 property, and land. Other adjustments in the notices of deficiency are derivative and depend on our resolution of the issue for decision.

Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

When the petitions in the instant cases were filed, all the petitioners[3] resided in Dallas, Tex. Petitioners D. A. Hunt, Dewey A. Hunt, Jr., and William J. Hunt are father and sons, respectively; they are hereinafter sometimes collectively referred to as "petitioner-husbands."

From 1965 through about 1971, petitioner-husbands acquired land and other property consisting of an apartment complex known as King Edward Village (hereinafter sometimes referred to as KEV), either in the form of a partnership or a joint venture.

On March 16, 1973, petitioner-husbands executed a contract in which they agreed to sell KEV to Southland Capital Corp. (hereinafter sometimes referred to as Southland) for $2,701,000. KEV is a 267-unit apartment complex located on three tracts of land, totaling about 11.8 acres. The March 16, 1973, contract provides that the $2,701,000 price is payable as follows:

A check dated 3–16–73 for $5,000.00 Cash (which Seller [petitioner-husbands] will deposit with Southwest Land Title Co. upon receipt as part payment, receipt of which is hereby acknowledged by Seller):

1. By the execution of an all-inclusive mortgage in the amount of $2,541,000 to be amortized over 25 years at 8.75% interest with monthly payments of $20,899.73. Said mortgage note will provide a balloon payment at the end of eight years or thereafter at the option of the Seller, if notice to call the balance is given twelve months prior to calling. Said all-inclusive mortgage is to be subject to, but in no wise assuming four existing underlying mortgages as indicated on Exhibit A. Said all-inclusive mortgage may be prepaid after eight years; by the Purchaser [Southland] with a prepayment penalty of 4% of the unpaid balance, declining ½ of 1% per year thereafter. [Certain illegible material omitted.]

2. By the execution of a Purchase Money Note, subordinate to the all-inclusive mortgage outlined above, in the amount of $155,000, due and payable four months from the date of closing, together with interest at 8.75% per annum.

3. By the delivery of a guaranty agreement executed by Mr. E. J. Gray, Chairman and major stockholder of Purchaser, guaranteeing the all-inclusive mortgage outlined in paragraph 1 above for the first twelve years only and guaranteeing the Purchase Money Note in its entirety.

---

[3]During 1973, petitioner D. A. Hunt was married to Altha Hunt. D. A. Hunt and Altha Hunt filed a joint Federal income tax return for 1973. Altha Hunt died before the petition was filed; her estate is a petitioner in docket No. 10890–78.

On March 26, 1973, several documents were executed by petitioner-husbands and Southland as to the sale of KEV. Petitioner-husbands executed a warranty deed conveying KEV for certain consideration, including execution and delivery of two notes as described in paragraphs 1 and 2 of the March 16, 1973, contract. The sale was subject to the terms and conditions in the warranty deed, which provides in part as follows:

IT IS UNDERSTOOD that prior indebtedness exists against the property hereby conveyed, and Grantee [Southland] accepts this conveyance subject
    but in nowise assuming
to/ the unpaid balances owing thereon, described as follows:

ONE NOTE dated October 3, 1966 in the original principal sum of $530,000.00 executed by W. J. Hunt, Dewey A. Hunt, Jr., and Dewey A. Hunt, Sr., and Bert F. Elsey, Sr., [4] payable to the order of State Mutual Life Assurance Company of America, * * *
ONE NOTE dated May 21, 1968 in the original principal sum of $1,400,000.00 executed by W. J. Hunt, Dewey A. Hunt, Jr., Dewey A. Hunt, Sr., and Bert F. Elsey[4] payable to the order of Southern Trust & Mortgage Company; * * *
ONE NOTE dated November 22, 1965 in the original principal sum of $385,000.00 executed by Dewey A. Hunt, Jr., W. J. Hunt, Bert F. Elsey, Sr.,[4] and Dewey A. Hunt, Sr., payable to the order of State Mutual Life Assurance Company of America; * * *
AND ONE NOTE dated May 30, 1968 in the original principal sum of $140,000.00 executed by W. J. Hunt, Bert F. Elsey,[4] Dewey A. Hunt, Sr., and Dewey A. Hunt, Jr. payable to the order of Lone Star Gas Company; * * *

AND Grantors herein covenant and agree to continue to pay all installments of principal and
            taxes and insurance
interest/accruing thereon as the same shall become due and payable and that should Grantors fail to pay any such installment, or installments as agreed, Grantee has the right to use all sums of money becoming due and payable on the vendor's liens secured hereby with which to cure any such default, or defaults.

        *      *      *      *      *      *      *

BUT IT IS EXPRESSLY AGREED and stipulated that the Vendor's Lien is retained against the above described property, premises and improvements, until the above described Notes and all interest thereon are fully paid according to their face and tenor, effect and reading, when this deed shall become absolute.

---

[4]The record does not explain whether Bert F. Elsey and Bert F. Elsey, Sr., are two separate persons or the same person, nor does the record explain what relationship, if any, such persons or person had to KEV or petitioner-husbands. Only petitioner-husbands are shown as sellers or grantors, in the Mar. 16, 1973, and Mar. 26, 1973, documents.

On March 26, 1973, petitioner-husbands had outstanding indebtedness against KEV in the amount of $1,963,222.69. On that date, the combined basis of petitioner-husbands in KEV was $1,576,410.29, allocated to each as shown in table 1:

TABLE 1

| | |
|---|---|
| D. A. Hunt | $549,536.95 |
| Dewey A. Hunt, Jr | 518,695.88 |
| William J. Hunt | 508,177.46 |

In payment of the purchase price for KEV, (1) Southland paid $5,000 to petitioner-husbands; (2) Glenn Alexander (hereinafter sometimes referred to as Alexander), in his capacity as Southland's president, executed a $155,000 purchase money note to petitioner-husbands; and (3) Alexander, in his capacity as Southland's president, executed a $2,541,000 vendor's lien note to petitioner-husbands. The vendor's lien note provides in part as follows:

The principal of this note, together with interest, is payable as follows: In monthly installments of $20,899.73 each, including both principal and interest, the first such installment becoming due and payable on the first day of May, 1973, and one installment becoming due and payable on the first day of each and every calendar month thereafter until this indebtedness is fully paid and satisfied; each installment, as and when paid, shall be credited first to accrued interest and the remainder to the principal hereof.

After April 1, 1981, and after the holders hereof shall have given the maker written notice of their intention twelve (12) months prior to that date, the holders hereof may declare the then entire unpaid balance of principal and all accrued, unpaid interest due and payable; and thereafter reserving the right to exercise this privilege at any time during the life of the note.

After April 1, 1981, the maker reserves the right to prepay this note in full by paying prepayment penalties as follows: During the ninth (9th) loan year a penalty equal to 4% of the unpaid principal balance, and during each succeeding loan year thereafter declining one-half of one per cent per year until, at the end of the sixteenth (16th) loan year, this note may be paid in full or in part at any time prior to its maturity without penalty.

This note is given in part payment for a certain lot or parcel of land situated in the County of Dallas, the State of Texas, being three (3) tracts of land situated in the City of Dallas, Texas, being more particularly described in the hereinbelow mentioned deed and deed of trust, this day conveyed to the undersigned by the payees hereof, and to secure the payment of same, according to the tenor hereof, a Vendor's Lien is retained in said conveyance and is here by acknowledged, and as further security for the payment hereof, a Deed of Trust is this day given to EDGAR W. LAYTON, TRUSTEE, for the benefit of the holders hereof, * * *

This note is this day given by the undersigned as part of the purchase price for said above mentioned property, and it is understood and agreed that failure to pay this note, or any installment as above promised or any interest hereon, when due, shall, at the election of the holder of said note, mature said note, and it shall at once become due and payable, and the Vendor's Lien or the Deed of Trust Lien herein mentioned, either or both, shall become subject to foreclosure proceedings, as the holders may elect.

All makers, endorsers, sureties and guarantors hereof hereby waive presentment for payment of this note, notice of non-payment, protest, notice of protest, diligence, or any notice of, or defense on account of, any extension, extensions, renewal, renewals, or change in any manner of or in this note, or in any of its terms, provisions or covenants, or by any delay, indulgence or other act of Trustee or any holder of aforesaid note.

Finally, Alexander, in his capacity as Southland's president, executed a deed of trust conveying KEV to Edgar W. Layton, trustee, "to secure and enforce the payment" of the above-described vendor's lien note and purchase money note. The deed of trust provides in part as follows:

It is agreed that if default be made in the payment of any principal or interest on said note, or in the performance of the covenants or agreements herein contained, or any of them, then at the option of the legal holder of said note, the whole of the principal debt herein secured, together with any accrued interest thereon shall become due and payable, and may be collected by suit or by proceeding hereunder; and it is further agreed that if said indebtedness is not paid when due, and is placed in the hands of an attorney for collection, or if collected through the Probate Court, ten per cent additional on full amount due shall be added as attorney's fees.

Now, THEREFORE, if the said indebtedness be paid, principal and interest, as the same becomes due and payable, and if the covenants and agreements herein contained be kept and performed, then and in that case only, this conveyance shall become null and void, and the property herein conveyed shall become wholly clear, and these presents released in due form at the Grantors' cost, otherwise to remain in full force and effect; but if default shall be made in the payment of this note, or any installment of interest thereon, when the same shall become due, or in case of the breach of any of the agreements or covenants herein mentioned, then at the request of the legal holder of said note, or any holder of any portion of the indebtedness secured hereby, the said Trustee, or his successor or successors appointed hereunder is hereby authorized and empowered to sell the land hereby conveyed, at public auction, to the highest bidder, for cash * * * and it is hereby agreed that the said Trustee, or his successor, may sell said property, together in lots or parcels, as to him shall seem expedient; and after said sale as aforesaid, shall execute and deliver to the purchaser or purchasers thereof, good and sufficient deed or deeds in law to the property so sold, in fee simple, with the usual warranties, and shall receive the proceeds of said sale, and out of the same shall pay: First, all charges, cost and expenses of executing this trust, including a reasonable fee to the Trustee; Second, the

note above described and all sums of money due or to become due hereunder, with interest as agreed; and Third, shall render the overplus, if any, unto the undersigned herein, or legal representatives or assigns; and any such sale shall not be held to exhaust the power of sale granted hereunder but such power of sale shall survive, and subsequent sales may be had in like manner so long as any of the indebtedness secured hereby remains unpaid.

WE FURTHER COVENANT to have the improvements on the property hereby conveyed insured against loss or damage by fire, explosion and storm in some good and solvent insurance company or companies authorized to do business in Texas and approved by the holder or holders of the indebtedness in the amount of their full insurable value or such lesser amount as may be satisfactory to the holder or holders of said indebtedness, such insurance to be payable, in the event of loss or damage, by the terms of the policy, to the holders of said indebtedness as their interest may appear, and to deliver the policy or policies, and all renewals thereof, as soon as written, to such holders, and to pay, before the same shall become delinquent, all taxes, and assessments which may be levied or assessed against said premises or any part thereof, ~~and to pay all principal and interest payments when due on all indebtedness against the above-described property, secured by superior or prior liens to those securing the note above described and hereby secured,~~ and we agree to continue said insurance in force until all of the indebtedness hereby secured has been paid in full. And it is especially agreed that if the undersigned shall fail to effect said insurance and deliver such policies, as herein provided, or to pay such taxes, assessments or payments on such prior indebtedness the holder of the note hereby secured may at his option declare the note hereby secured due and payable, or the said insurance may be effected, and the said taxes, assessments, or payments on such prior indebtedness may be paid by the legal holder of the note secured hereby, and the sum so expended shall be a demand obligation and become a part of the debt hereby secured, and shall draw interest at the rate of eight per cent per annum from the date so expended until paid.

\*        \*        \*        \*        \*        \*        \*

THE HOLDER OR HOLDERS of the indebtedness hereby secured, as further security thereof, shall, in event of default hereunder, have the right to take possession of said premises, and shall have the right to receive and collect the rents thereafter accruing on the property hereby conveyed and apply the same as a credit on any indebtedness secured hereby.

IN THE EVENT of foreclosure under the power herein granted, the Grantors, their heirs, successors or assigns, or any person in possession of said premises, shall thereupon become the tenant at will of the purchaser at such foreclosure sale, and should such tenant refuse to surrender possession of said premises upon demand, the purchaser shall thereupon be entitled to institute and maintain the statutory action for forcible detainer and procure a writ of possession thereunder.

\*        \*        \*        \*        \*        \*        \*

~~Should Grantors make default in the punctual payment of any prior lien indebtedness now existing against the property herein described, or any part thereof, principal or interest, as the same shall become due and payable,~~

then- the- whole- amount -of -the -indebtedness -hereby- secured -remaining unpaid,- shall,- at -the -option -of- the -Beneficiary,- or -other- [illegible]- hereof, without- demand,- presentment -and- notice -immediately- mature -and- become payable,- and -it- shall -thereupon,- or- at- any- time- thereafter,- the -same- or- any part -thereof- remaining -unpaid,- be- the -duty -of -the -Trustee -herein,- and- of- his successor- or- substitute,- on -the -request- of- said- beneficiary,- or -other- holder hereof,- to- enforce -this -Trust -as- herein- provided.

Petitioners are entitled to report gain from the sale of KEV under the provisions of section 453(b).

During 1973, pursuant to the sale of KEV, petitioner-husbands received payments from Southland totaling $186,465, or $62,155 each.[5]

## OPINION

Section 453[6] provides, in relevant part, that in the case of an installment sale, income need not be reported until "actually received". Also, the amount to be reported in any one year is the proportion of the installment payments received that year,

---

[5]So stipulated. We assume that this stipulation is not meant to control the issue of whether the excess of mortgage over basis is to be treated as a payment in the year of sale for purposes of sec. 453.

[6]Sec. 453 provides in relevant part as follows:

SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

\*     \*     \*     \*     \*     \*     \*

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, \* \* \*

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

The revision of the foregoing provisions by sec. 2(a) of the Installment Sales Revision Act of 1980, Pub. L. 96–471, 94 Stat. 2247, does not apply to the years in issue; the amendments by secs. 1951(b)(7)(A) and 1906(b)(13)[sic](A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1838, 1834, also do not apply to the years in issue.

that the gross profit bears to the total contract price. Section 453(b)(1)(A) provides that this method may be used for installment sales of real property "under regulations prescribed by the Secretary."

Section 1.453–4(c), Income Tax Regs.,[7] provides rules for applying the installment sales provisions to mortgaged real property, "whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser." In such a case, the amount by which the mortgage liability exceeds the seller's basis is to be treated as a payment received in the year of sale. Also, the mortgage liability is to be excluded from the total contract price, except to the extent of this excess. The latter rule has the effect of reducing the denominator (in the fraction—gross profit divided by total contract price), and thereby increasing the portion of each installment payment that is treated as profit. In fact, where the mortgage liability exceeds the seller's basis, the latter rule requires 100 percent of each installment payment to be treated as profit.

Respondent contends that the amounts by which each petitioner-husband's share of the existing underlying debt exceeds his share of basis in KEV constitutes a payment received in 1973 and so taxable to petitioners in 1973;[8] also that the amount of the debt is included in the total contract price, only to the extent of this excess under section 453. Respondent maintains that this is so because "the purchaser

---

[7]Sec. 1.453–4 Sale of real property involving deferred periodic payments.

(c) Determination of "selling price". In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and sections 1.453–1 through 1.453–7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. The term "payments" does not include amounts received by the vendor in the year of sale from the disposition to a third person of notes given by the vendee as part of the purchase price which are due and payable in subsequent years. Commissions and other selling expenses paid or incurred by the vendor shall not reduce the amount of the payments, the total contract price, or the selling price.

[8]The parties agree that petitioners are entitled to defer recognition of gain on the sale of KEV under sec. 453(b). Even if we were to agree with respondent that this excess of mortgage liability over basis is to be treated as a payment in the year of sale, that would not cause the transaction to fail the 30-percent test of sec. 453(b)(2)(A)(ii).

acquired the property 'subject to'" the underlying debt, within the meaning of section 1.453–4(c), Income Tax Regs.[9] Petitioners contend to the contrary because petitioner-husbands are expected to continue to pay the underlying debt out of the proceeds of the sale, relying on our opinions in *United Pacific Corp. v. Commissioner*, 39 T.C. 721 (1963); *Estate of Lamberth v. Commissioner*, 31 T.C. 302 (1958); *Stonecrest Corp. v. Commissioner*, 24 T.C. 659 (1955).

Under respondent's approach, petitioners in each case would be required to treat as a payment received in 1973 the respective petitioner-husband's share of the approximately $400,000 excess of mortgage liability over basis. Also, petitioners in each case would be required to treat as profit 100 percent of the $62,155 received by the respective petitioner-husband.

Under petitioners' approach, petitioners in each case would be required to treat as profit approximately 40 percent[10] of the $62,155 received by the respective petitioner-husband; there would be no 1973 inclusion on account of the excess of mortgage liability over basis.

We agree with petitioners.

*Stonecrest Corp. v. Commissioner, supra*, dealt with application of a provision (similar to sec. 1.453-4(c), Income Tax Regs.) in the regulations[11] under section 44, I.R.C. 1939,[12] to a

---

[9]Respondent concedes that Southland did not assume the underlying debt.

[10]The percentage depends on the petitioner-husband's basis. See table 1 *supra*.

[11]The provision, interpretation of which was in issue in *Stonecrest*, states as follows:

Regs. 111:

SEC. 29.44–2. SALE OF REAL PROPERTY INVOLVING DEFERRED PAYMENTS.— * * *

*     *     *     *     *     *     *

In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall be included as a part of the "selling price," but the amount of the mortgage, to the extent it does not exceed the basis to the vendor of the property sold, shall not be considered as a part of the "initial payments" or of the "total contract price," as those terms are used in section 44, in sections 29.44–1 and 29.44–3, and in this section.

[12]Sec. 44, I.R.C. 1939, provided in part as follows:

SEC. 44. INSTALLMENT BASIS.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

number of conditional sales of real property. We interpreted the purpose and meaning of the statute and regulation as follows (24 T.C. at 665–666):

In the case of real property sold on the installment plan where there was a mortgage on the property which the buyer either assumed or took the property subject to, the statutory scheme of returning a portion of each payment as income in the year received did not reach all of the seller's profit, since the total amount of the selling price was not paid over by the buyer to the seller; that portion of the selling price represented by the mortgage was paid by the buyer directly to the mortgagee. To remedy this, regulations were issued by the Commissioner and approved by the Secretary of the Treasury to provide that the amount of the mortgage, to the extent that it did not exceed the seller's basis in the property sold, was not to be considered a part of the "initial payments" or of the "total contract price." [Citation omitted.] The reduction in the total contract price had the effect of increasing the percentage of each installment payment to be returned as income, thereby reaching the entire profit on the sale. The amount by which the mortgage exceeded the seller's basis in the property was treated as a part of the initial payments and was added to the seller's basis in computing total contract price. The regulation was upheld in a case involving the sale of mortgaged property where the buyer unequivocally "assumed" the mortgage, as a fair attempt to carry out the intent of Congress. *Burnet v. S. & L. Bldg. Corp.*, 288 U.S. 406 (1933).

\* \* \* \* \* \* \*

While the regulation first refers broadly to "the sale of mortgaged property," the language following this broad reference describes the two types of sales of mortgaged property to which the regulation applies: (a) Where a buyer takes property subject to mortgage, or (b) assumes the mortgage. These expressions we take to have the meaning customarily attributed to them in transactions concerned with the transfer of mortgaged property. *Crane v. Commissioner*, 331 U.S. 1, 6 (1947). Taking property subject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i. e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obliged to, the buyer will ordinarily make the

---

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALITY.—In the case \* \* \* of a sale or other disposition of real property. if \* \* \* the initial payments do not exceed 30 per centum of the selling price \* \* \* , the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

payments on the mortgage debt in order to protect his interest in the property. Where a buyer assumes a mortgage on property, he pays the seller for the latter's redemption interest, and in addition promises the seller to pay off the mortgage debt. This promise of the buyer can ordinarily be enforced by the mortgagee. 5 Tiffany, The Law of Real Property, secs. 1435, 1436 (3d ed. 1939); IV American Law of Property, secs. 16.125, 16.127, 16.128–16.132 (1952).

In *Stonecrest*, the seller constructed housing developments consisting of individual residences. The typical sale of an individual residence involved the buyer agreeing to make a downpayment and monthly payments thereafter, until the total purchase price plus interest was paid. The agreement recited that a deed of trust had conveyed property to trustees to secure payment of a promissory note executed by the seller. The seller agreed to apply the installment payments to the loan secured by the deed of trust. At some point, the residence was to be conveyed to the buyer, who was thereafter to assume payment of the promissory note secured by the deed of trust.

After analyzing the facts in *Stonecrest*, we concluded that the regulation did not apply to the year of sale because as of that year the buyer had neither assumed the mortgage nor taken the property subject to the mortgage. We pointed out that "assumption of a mortgage means that the buyer takes over the seller's obligation to the mortgagee and incurs an obligation generally enforceable by the mortgagee." 24 T.C. at 667. In *Stonecrest*, the agreement of the buyer and seller provided that this was to occur when the property would be conveyed, and the conveyance was not to occur until after the year of sale. We analyzed the "subject to" alternative as follows (24 T.C. at 667–668):

Nor was any sale made by petitioner "subject to" a mortgage in the ordinary usage of that expression. The expression means that the buyer has no personal obligation to pay the mortgage debt; that, as between seller and buyer, the seller has no obligation to pay the debt; and that the debt is to be satisfied from the property. Here there was no understanding that the debt was to be satisfied out of the property; instead it was explicitly provided in the agreement of the parties that the seller was to make the payments on the mortgage debt until there was a conveyance of the property. It has been stated that in determining whether or not a transfer is subject to a mortgage,

"A circumstance which is usually of controlling importance in this regard is whether the mortgage was considered in adjusting the purchase price. If the price was reduced by reason of the mortgage, it is a reasonable conclusion

that it was intended that the debt, either in whole or in part, should be imposed on the land in the hands of the transferee rather than on the transferor, while if the full agreed value of the land was paid, it may be concluded that the parties intended the grantor to pay the mortgage debt out of the proceeds of the sale. [Tiffany, sec. 1435, p. 365.]"

In this case there was no reduction in selling price because of the mortgage and it seems clear that the seller was intended to pay the mortgage debt out of the proceeds of the sale. By his interpretation respondent would extend the application of the regulation to every sale of property that has a mortgage on it. While in a sense every sale of mortgaged property is subject to a mortgage since the property remains liable to have the mortgage debt satisfied from it, we think the expression was used in the regulation in its customary meaning, to define the obligations of the parties to a sale of property with respect to the mortgage debt. See Tiffany, *supra*, sec. 1435.

The *Stonecrest* approach was followed in *Estate of Lamberth v. Commissioner*, *supra*, where we similarly discussed the purpose and meaning of the statute and regulation. We analyzed the effect of respondent's view of the regulation, and its conflict with the statute, as follows (31 T.C. at 317–318):

The respondent's method would cause difficulties of another sort. Applying his method to our typical transaction, the amount of the mortgage, $10,400, in excess of cost, $8,517, or $1,883, would be included in the initial payment. The total selling price of $15,495 would be reduced by the amount of the mortgage not in excess of cost, or by $8,517, to arrive at a total contract price of $6,978, which sum is, of course, equal to the gross profit. Therefore, applying the rule of section 44, since the ratio of gross profit to total contract price would be 1 to 1, the entire amounts of the initial payments and subsequent payments would be taxed until they totaled $6,978. By this method the gross profit on the sale would be taxed in approximately the first 5 years, although payments to the partnership would continue for another 5 years. However, it was the purpose of section 44 that a constant proportion, determined by a fixed ratio of gross profit to total contract price, of each installment payment be returned as income. It was not intended that the first payments be taxed completely to the extent of gain and that the latter payments represent recovery of cost and be tax free. [Fn. ref. omitted.]

In *United Pacific Corp. v. Commissioner*, *supra*, involving the 1954 Code and the same regulation as is involved in the instant cases, respondent asked us to reconsider our opinions in *Stonecrest* and *Lamberth*, both *supra*. We instead endorsed the position we had taken in *Stonecrest* and *Lamberth*. We concluded that respondent's regulation did not apply.[13]

[13]Respondent published nonacquiescences as to *Stonecrest v. Commissioner*, 24 T.C. 659 (1955), at 1956–1 C.B. 6, and as to *Estate of Lamberth v. Commissioner*, 31 T.C. 302 (1958), at

In *Voight v. Commissioner*, 68 T.C. 99 (1977), affd. 614 F.2d 94 (5th Cir. 1980), we again endorsed our *Stonecrest* line of cases. We concluded in *Voight* that the purchaser therein assumed the underlying debt, since the purchaser was obligated directly to the mortgagee, the purchaser paid the mortgagee directly, and all the parties to the transaction intended that the purchaser pay the mortgagee directly. 68 T.C. at 113–114. We also pointed out (68 T.C. at 114 n. 8) the following:

> A contrary holding in this case would offend the purpose of the regulation that we here apply. Upholding the application of the corresponding regulation under the Revenue Act of 1926 in *Burnet v. S. & L. Building Corp.*, 288 U.S. 406 (1933), the Supreme Court held that the regulation was intended "to place a reasonable limitation upon the spread of the tax." The Court was especially sensitive to the problems that arose because the excess of the mortgage over the basis "would never actually come into the vendor's hands." Here, as in the case of an ordinary assumption, no part of the amounts in satisfaction of the mortgage would ever actually be received by the seller. See *Kirschenmann v. Commissioner*, 57 T.C. 524, 527–529 (1972), revd. on other grounds 488 F.2d 270 (9th Cir. 1973).

*Goodman v. Commissioner*, 74 T.C. 684 (1980), affd. without published opinion 673 F.2d 1332 (7th Cir. 1981), involved a wraparound mortgage with immediate transfer of title. Payments were made by the buyers to a banking institution, which was to deduct from each payment the amounts required to service the underlying debts and remit these amounts to the mortgagee. We held that, under the *Stonecrest* line of cases, the banking institution was a conduit for payments directly (i.e., not through the seller) from the buyers to the mortgagee and, accordingly, the buyers were treated as having taken the property subject to the underlying debt. Since we held that respondent's regulation applied to the transaction even under the *Stonecrest* line of cases, we reserved decision on whether the *Stonecrest* analysis of respondent's regulation should apply to a wraparound mortgage with immediate transfer of title. 74 T.C. at 712 n. 16.

---

1959–1 C.B. 6. Respondent appealed *Stonecrest*, but the appeal was dismissed by agreement of the parties. Respondent then appealed *United Pacific Corp. v. Commissioner*, 39 T.C. 721 (1963), but that appeal, too, was dismissed.

In *Republic Petroleum Corp. v. United States*, 613 F.2d 518 (5th Cir. 1980), the seller was "the majority shareholder and the ultimate decision maker" of the buyer. The seller and buyer executed an "Act of Sale and Assumption of Mortgage," under which the buyer expressly assumed the mortgage. Four days later, the seller and buyer signed a letter agreement modifying the earlier agreement and providing for a promissory note from the buyer to the seller in approximately the amount of the mortgage. The buyer appears to have paid the mortgagee directly from time to time; it made most of the payments to the seller but in amounts relating to the seller's need to pay the mortgagee rather than in the amounts the buyer was to pay under its promissory note. The Court of Appeals, noting that the seller, in his claim for refund of taxes had admitted that the buyer assumed the mortgage held that the substance of the transaction, and the intent of the parties thereto, was that the buyer assumed the mortgage. 613 F.2d at 524. The seller was held to have failed the 30-percent test (see sec. 453(b)(2)(A)(ii)) and thus was not entitled to the benefits of the installment sales provisions.

In the instant cases, the selling price does not appear to have been reduced on account of the underlying debts; respondent does not contend otherwise. The parties to the transaction expected petitioner-husbands to satisfy the underlying debts; respondent appears to concede as much and does not contend that the debts were to be satisfied out of KEV. The entire selling price was to be paid directly to petitioner-husbands by Southland. The record does not suggest that Southland paid, or was intended by the parties to the transaction to pay, the underlying debt service to the mortgagee directly or through a conduit, as in *Goodman v. Commissioner, supra*. Unlike the situation in *Republic Petroleum Corp. v. United States, supra*, the record does not include any evidence (and respondent does not contend) that petitioner-husbands controlled Southland, that Southland made payments to the mortgagees, or that Southland's payments to petitioner-husbands related to the latter's obligations to the mortgagees rather than to Southland's obligations to petitioner-husbands.

Under the *Stonecrest* line of cases, the foregoing leads us to conclude that Southland did not take KEV subject to the underlying debt.

As respondent points out, the warranty deed recites that Southland took KEV "subject to" the underlying debts. We dismissed a similar argument in *Voight v. Commissioner*, 68 T.C. at 111 n. 6, as follows:

Respondent also urges this Court to give weight to language in the mortgage loan amendment which described the interest acquired by the purchaser as "being subject and subordinate to the lien of each of the mortgages securing said mortgage loans." This language does not support respondent, however. It is merely an acknowledgment that the sale is of property subject to the mortgage in the sense that all sales of mortgaged property are subject and subordinate to the existing prior lien created by the mortgage. This Court expressly rejected this characteristic as a determinative factor under the regulation in *Stonecrest Corp. v. Commissioner, supra* at 668.

The same analysis applies in the instant cases.

Respondent contends that the instant cases are distinguishable from our opinions in *Stonecrest v. Commissioner, Estate of Lamberth v. Commissioner*, and *United Pacific Corp. v. Commissioner*, all *supra*, on the basis that in these three cases there was no conveyance of the property in the year of each conditional sale. He states that he "considers this a fundamental distinction."

In *Estate of Lamberth v. Commissioner*, 31 T.C. at 317, we emphasized that application of the regulation (substantially the same as the one at issue) was not dependent directly on whether title was conveyed. In *Lamberth*, we held that conveyance of title was important because, under the agreement there involved, the buyer was to make payments directly to the mortgagee after title was conveyed. Thus, on the facts in *Lamberth*, conveyance of title was the occasion for the transaction to become subject to the underlying debt, under the *Stonecrest* "subject to" analysis. In the instant cases, the conveyance of title did not change liability for the underlying debt nor did it result in the buyer's making payments to the mortgagee rather than to petitioner-husbands. The conveyance of title by petitioner-husbands to Southland, and the essentially simultaneous conveyance by Southland to the trustee were merely security devices to protect the interests of both sides to the transfer. We conclude that the conveyance of title to Southland does not cause the instant cases to fall outside the analysis of the *Stonecrest* line of cases. We reject

respondent's contention that this is a "fundamental distinction."

Finally, respondent contends that the transaction at issue falls within the meaning of section 1.453–4(c), Income Tax Regs., because it "took the form of a wrap-around mortgage which was beneficial to both of the parties involved in this sale." In making this argument, respondent notes that: "The primary advantage accruing to a seller in this situation is that he remains personally liable on the underlying indebtedness and can insure that this indebtedness is serviced on a current basis." Respondent contends that "petitioners should not complain of the harshness of this rule [i.e., respondent's understanding of section 1.453–4(c), Income Tax Regs.] for the reason that the sales transaction was, in all likelihood, intentionally structured in this manner by the petitioner-husbands and the purchaser of the property in order to obtain significant economic benefits and convenience resulting therefrom."

Respondent misconceives the legal setting in which we operate. The Congress long ago decided that a seller should not have to recognize a portion of the gain currently if the sale was so structured that the seller did not currently receive that portion of the gain, and if certain requirements of the statute were met. The Congress did not require the taxpayer to be unhappy, as a condition to obtaining the benefits of section 453. Respondent's regulatory efforts to deal with potential tax abuse situations were endorsed by the courts. E.g., *Burnet v. S. & L. Bldg. Corp.*, 288 U.S. 406 (1933). And we have upheld respondent's efforts in some circumstances to tax the entire gain currently where the seller appeared to have obtained the substantial benefit of the entire gain currently even though payment was delayed as a formal matter. E.g., *Lustgarten v. Commissioner*, 71 T.C. 303 (1978), affd. 639 F.2d 1208 (5th Cir. 1981).

In the instant cases, petitioners have satisfied the requirements of the statute; they have satisfied the requirements of respondent's regulations as we have interpreted them for more than a quarter-century (respondent chose not to pursue an appeal from any of this Court's three leading cases so interpreting his regulations (see note 13 *supra*)); and they neither received current payment nor the practical benefit of

current payment of the underlying debt. We do not see in the instant cases any tax abuse of the sort that resulted in the *S. & L. Bldg. Corp.* and *Lustgarten* decisions.

Respondent's "harshness" analysis undercuts his legal contention that KEV was sold subject to the underlying debt. We see no merit to his contention, if it is viewed as a policy argument, for disregarding both the statute and our settled interpretation of respondent's regulations, merely because petitioner-husbands may have received "significant economic benefits and convenience" from the form of the transaction.

Respondent's argument may be viewed as a contention that the *Stonecrest* line of cases does not apply to wraparound mortgages (a contention we reserved decision on in *Goodman v. Commissioner*, 74 T.C. at 712 n. 16). We see no reason for refusing to apply the same tests regardless of the form of the transaction. In *Goodman*, the relevant substance of the transaction was that the payments were not to go to the seller. This gave rise to the policy problem that respondent's regulation was designed to resolve, even though the statutory language did not appear to deal with the matter. See *Burnet v. S. & L. Bldg. Corp.*, 288 U.S. at 414–415. Accordingly, in *Goodman*, we held for respondent. Similarly, in *Republic Petroleum*, the substance of the transaction was held to be an assumption. The instant cases illustrate that such policy problems are not a necessary concomitant to the use of the wraparound financing device. The *Stonecrest* line of cases provides an appropriate analysis of respondent's regulations in wraparound mortgage cases as well as other cases. Accordingly, so long as respondent's regulations remain unchanged,[14] we will not exclude wraparound mortgages per se from our *Stonecrest*-line analysis.

In view of respondent's contentions regarding harshness of consequences, it may be appropriate to contrast the operation of section 1.453–4(c), Income Tax Regs., in a situation where

---

[14]The Installment Sales Revision Act of 1980, Pub. L. 96–471, 94 Stat. 2247, changed the provisions of sec. 453 in many significant respects. Temporary regulations as to the Installment Sales Revision Act of 1980 were issued by T.D. 7768 (1981–1 C.B. 296), published Feb. 4, 1981 (46 Fed. Reg. 10, 708), and amended by T.D. 7788 (1981–2 C.B. 109), published Oct. 5, 1981 (46 Fed. Reg. 48,920). These temporary regulations do not purport to apply to the years before the Court and so we make no comment on what the result would be under these temporary regulations in the factual setting of the instant cases.

the buyer pays the underlying mortgage debt to the mortgagee (as in *Voight* and *Goodman*), with the situation where the buyer makes all the payments to the seller (as in the instant cases).

Assume that (1) the seller sells property for $1,000 to be paid in five equal installments, (2) there is an underlying mortgage debt of $500, and the seller's basis is $400. Table 2 compares the impact of the regulation on a *Voight*-type or a *Goodman*-type hypothetical (in which the buyer pays $100 each year to the seller and $100 each year to the mortgagee), with the results as if the regulation were applied to a hypothetical along the lines of the instant cases (in which the buyer pays $200 each year to the seller).

TABLE 2

| | Profit to be recognized | | | |
|---|---|---|---|---|
| Year | Payments of $100 to seller and $100 to mortgagee | | Payments of $200 to seller | |
| 1 | Excess of mortgage over basis | $100 | Excess of mortgage over basis | $100 |
| | Payment to seller | 100 | Payment to seller | 200 |
| | Total: year 1 | 200 | Total: year 1 | 300 |
| 2 | | 100 | | 200 |
| 3 | | 100 | | [1]100 |
| 4 | | 100 | | ([1]) |
| 5 | | 100 | | ([1]) |

[1] Presumably, no more income would have to be recognized after the seller has reported the entire gain ($1,000 sales price, less $400 basis, equals $600 gain). However, the regulation does not in terms provide for such a limit.

Thus, respondent's reading of his regulation would impose a harsher regimen on the taxpayer who runs the total contract price and gross profit through his books than respondent would impose on the taxpayer whose books do not reflect the total contract price and gross profit. Respondent seeks to treat the nonabuse situation more harshly than the tax abuse situation that the Supreme Court focused on in *Burnet v. S. & L. Bldg. Corp.*, 288 U.S. at 414.

We do not read respondent's regulation to require such a perverse result. Clearly, the statute does not require such a perverse result. Cf. *Commissioner v. Stickney*, 399 F.2d 828, 834–835 (6th Cir. 1968), affg. *Haserot v. Commissioner*, 41 T.C. 562, 570 (1964).

Accordingly, we conclude that Southland did not take KEV subject to the mortgages and that Southland did not assume the mortgages. From this we conclude that section 1.453–4(c), Income Tax Regs., does not apply, and so (1) the excess of mortgage liability over basis is not treated as a payment received by petitioner-husbands in 1973, and (2) no part of the mortgages is excluded from the total contract price for purposes of determining the proportion used in applying section 453(a)(1).

We hold for petitioners on the one issue presented for decision.[15]

To reflect the concessions by petitioners (see note 2 *supra*),

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

Körner, *J.*, did not participate in the consideration and disposition of this case.

---

[15]Both sides in the instant cases agree as to the total amounts of petitioner-husbands' gain. Thus, we are not presented with the problem faced by the Supreme Court in its recent opinion in *Commissioner v. Tufts*, 461 U.S. ___(1983).