PROFESSIONAL EQUITIES, INC., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 42558-84.     Filed July 23, 1987.

---

*Paul Frederic Marx*, for the petitioner.
*Ross W. Paulson*, for the respondent.

OPINION

RAUM, *Judge*: The Commissioner determined a deficiency in petitioner's fiscal 1981 income tax in the amount of $28,540. At issue is the proper amount of gain to be recognized in petitioner's 1981 tax year on its installment sales of land in which "wraparound mortgages" are taken as part of the payment price.

The parties agree that the governing statutory provisions are in section 453(c) of the Code. That section provides that the income recognized in any taxable year is "that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price". In determining the proper proportion, there is no dispute between the parties as to the computation of the numerator of the relevant fraction, i.e., "gross profit", which is simply the sales price minus the seller's basis and costs of sale. In controversy, however, is the computation of the denominator, "the total contract price", in the circumstances of this case, involving the taxpayer's wraparound sales. Petitioner argues that the total contract price here is simply the sales price or selling price used in computing the gross profit in the numerator. On the other hand, the Government contends that the total contract price is the sales price minus the amount of petitioner's outstanding mortgage liabilities. Petitioner's position is consistent with judicial decision and regulations of long standing, but the Government relies on temporary regulations promulgated after enactment of legislation in 1980 known as the Installment Sales Revision Act of 1980. Both parties agree that if these new regulations are valid, the Government is entitled to prevail. The pivotal issue therefore is whether these new provisions in the temporary regulations are to be sustained.

Professional Equities, Inc. (petitioner or Professional Equities), is a corporation organized under the laws of California. Its principal office is located in Laguna Hills, California. It uses the accrual method of accounting, and keeps its books and records and files its Federal income tax

returns on the basis of an August 31 fiscal year. Petitioner timely filed a U.S. Corporation Income Tax Return for its fiscal year ended August 31, 1981, with the office of the Internal Revenue Service at Fresno, California.

Professional Equities' business consists of buying undeveloped parcels of land and reselling such parcels to purchasers. A wraparound mortgage, hereinafter explained, is created on the resale of the land.

When petitioner buys land, it either assumes an existing mortgage[1] encumbering the land, or gives the seller a purchase money note and enters into a deed of trust agreement securing the note. In some instances, petitioner uses both of these methods to finance the purchase price. In the context of the later resale of the land, these obligations petitioner has placed on the land in purchasing it, are referred to as "underlying" or "wrapped" indebtedness.

Generally, petitioner resells the land using conditional sales contracts in which the buyer gives petitioner, as seller, a "wraparound" mortgage in addition to a downpayment of approximately 10 percent of the selling price.[2] The wraparound mortgage given petitioner by the purchaser is a new mortgage,[3] the principal amount of which includes the unpaid balance of the wrapped or underlying indebtedness previously placed on the land at its purchase by petitioner. The buyer does not assume or take the property subject to the underlying indebtedness. Instead, petitioner is liable for and makes the payments on the wrapped indebtedness while the purchaser is liable for and makes payments to petitioner on the wraparound indebtedness, i.e., the installment obligation. After petitioner has resold the land to a purchaser, it services the underlying mortgage on the parcel with the payments received from the purchaser. Petitioner's obliga-

---

[1] In assuming the mortgage on the land, petitioner actually assumes the "Trust Deeds" entered into between its seller and the owner from whom the seller purchased the land. These "Trust Deeds" or "Deeds of Trust" secure a promissory note of petitioner's seller, and it is the obligation on these notes that petitioner presumably assumes when petitioner is said to assume the mortgage on the land bought.

[2] From the record, it would appear that the selling price referred to by the parties here is the "deferred payment price" of the land which includes both the "cash price" and the "finance charge" or "interest on the unpaid balance of the cash price".

[3] Since, as set forth hereinafter, petitioner does not convey title to the purchaser at the time of the installment sale and since there could not thus be any reconveyance to petitioner as a security mortgage, it is perhaps inaccurate to refer to the purchaser's obligation as a "mortgage" at all. However, the parties have so used this terminology, and for convenience, we will do the same here.

tion to its creditors to make the payments on the underlying mortgage is not dependent, however, on whether petitioner receives timely payment from the purchaser. In addition, petitioner is not required to service the underlying obligation from the payments received from the purchaser.

In the sales at issue, the wraparound indebtedness is payable to petitioner in monthly installments over a period of 10 to 15 years and bears a rate of interest which is higher than that on the underlying mortgage. At the time of resale by petitioner, the underlying mortgages on the land do not exceed petitioner's basis in the land.

Under the contracts of sale, legal title to the land is not deeded to the purchaser until the purchaser has paid petitioner the entire balance of the selling price together with interest. Petitioner's "Standard Agreement of Sale" describes this condition on the transfer of title as follows: "When Buyer has fully performed this Agreement in accordance with its terms * * * Seller will then execute and deliver to Buyer a deed which will convey good and sufficient title to said realty".

The parties have submitted to the Court documents used by petitioner in a "typical" land purchase and sales transaction. These exhibits support the foregoing stipulated description of the transactions entered into by petitioner. They show first that in the contract of sale, petitioner agreed to "keep encumbrances of record current, so long as Buyer [of the particular parcels involved] is not in default". They further reveal that petitioner received, on the sale of land, installment obligations from which its obligation on the underlying mortgage could readily be discharged. On the sale of the "typical" parcels, petitioner received a right to monthly payments of $320, $300, $209.89, and $209.89, totaling $1,039.78 a month, or $12,477.36 a year. Petitioner's continuing obligation on the underlying mortgages amounted to only approximately $3,500 a year for the first 6 years after it purchased the land and approximately $4,200 a year thereafter.[4] The payments received on the installment sales were greater than the payments petitioner owed on the underlying mortgages both because the princi-

---

[4]Doubt as to the precise amount of the payments owed by petitioner is due to adjustments made at the escrow closing to the amount of the mortgage assumed by petitioner.

pal amount of the $104,000 obligation due petitioner (the so-called wraparound mortgage) was larger than that of the $44,080 underlying mortgages, and because the interest rate on the obligation due petitioner (8¾ percent) was higher than that on the underlying mortgages (7 and 8 percent).

The deficiency in income tax stems from the Commissioner's determination that petitioner has, on its 1981 return, incorrectly computed the proportion of the payments received on installment sales in that year to be recognized as gain. All such payments were made in 1981 on sales that occurred in 1981.

It is stipulated that petitioner was entitled to report its income under section 453 in the year before us. Section 453 allows gain on an installment sale to be reported on a deferred basis. It permits "the spreading of the income tax over the period during which payments of the sales price are received" and thus "alleviates possible liquidity problems which might arise from the bunching of gain in the year of sale when a portion of the selling price has not actually been received". H. Rept. 96-1042, at 5 (1980); S. Rept. 96-1000, at 7 (1980), 1980-2 C.B. 494, 497. See *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948). This spreading of gain is achieved by dividing each installment payment and applying "part [to] return of capital and part to profit". *Burnet v. S.&L. Bldg. Corp.*, 288 U.S. 406, 413 (1933).

Section 453[5] provides in relevant part as follows:

SEC. 453(c). INSTALLMENT METHOD DEFINED.—For purposes of this section, the term "installment method" means a method under which the income recognized for any taxable year from a disposition *is that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price.* [Emphasis supplied.]

---

[5]Sec. 453 appears as amended by the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247. Those amendments were made effective for "dispositions made after the date of enactment of this Act [Oct. 19, 1980] in taxable years ending after such date". 94 Stat. 2256. The temporary regulations interpreting this section of the Act were also made applicable to installment sales "occurring after October 19, 1980". Sec. 15A.453-O(a), Temporary Regs. Shortly thereafter, however, the temporary regulations were amended to provide that they would "apply generally to any installment sale after March 4, 1981 unless the installment sale was completed before June 1, 1981 pursuant to a written obligation binding on the seller that was executed on or before March 4, 1981". T.D. 7788, 1981-2 C.B. 110, 111. The Commissioner's adjustments with respect to petitioner's 1981 year appear to be properly limited to sales made between Mar. 5, 1981, and the end of petitioner's Aug. 31, 1981, fiscal year, the period during which the temporary regulations construing sec. 453(c) were applicable.

In essence, section 453(c) requires the taxpayer to recognize as gain a percentage of the payments received from an installment sale in any year. The amount required to be recognized is determined by multiplying the payments received by a fraction, the numerator of which is the gross profit to be realized on the sale and the denominator of which is the total contract price.

The parties' disagreement centers on the proper calculation of the total contract price or the denominator in this fraction. Respondent argues that petitioner must reduce the total contract price by the underlying mortgage in accordance with newly issued temporary regulations. Petitioner argues that the contract price is simply the same sales price used to determine the gross profit in the numerator. It contends that it need not, as respondent asserts it must, "deduct the amount of the underlying mortgage (deed of trust) * * * in computing the contract price of each sale". In so arguing, petitioner maintains that the temporary regulations that support the Commissioner's position are invalid both because unsupported by the statute and because they are in conflict with an opinion of this Court (*Stonecrest Corp. v. Commissioner*, 24 T.C. 659 (1955)), and the regulations that opinion interprets.[6] Because it claims that the temporary regulations are invalid, petitioner relies instead on the well-established judicial interpretation in *Stonecrest* of those regulations that the temporary regulations were meant to supplant.

The interpretation upon which petitioner relies to support its calculation of gain to be recognized was first set out in *Stonecrest Corp. v. Commissioner*, 24 T.C. 659 (1955). In that case, the Court was called upon to interpret the regulations that governed the reporting of installment sales. At that time those regulations provided as follows (sec. 29.44-2, Regs. 111):

In the sale of mortgaged property the amount of the mortgage, *whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser*, shall be included as a part of the "selling price," but *the amount of the mortgage, to the extent it does*

---

[6]Petitioner, in its reply brief, also suggests that the regulations should have been issued "pursuant to the general notice, comment and public hearing procedure required by Section 553 of Title Five of the United States Code". That issue is not properly before us, and we do not consider it.

*not exceed the basis to the vendor of the property sold, shall not be considered as a part of the "initial payments" or of the "total contract price,"* as those terms are used in [the predecessors to section 453 and accompanying regulations].

Essentially the same regulations applied to "subject to" and "assumed" sales just before the temporary regulations were filed; they too required the contract price to be reduced by the underlying mortgages.

In *Stonecrest*, the Court determined that the regulations quoted above did not apply to the installment sales involved there. The sales before the Court in the *Stonecrest* case were essentially like those before us now, i.e., the various sales prices were financed at least in part by wraparound obligations. In *Stonecrest*, the Court's conclusion that the regulations did not apply to the wraparound sales therein was based upon its interpretation of the predecessor to section 453 and application of its understanding of the installment method required by that section in the context of the wraparound sales before it. Under the Court's interpretation in *Stonecrest*, there was no justification for reducing the sales price by the amount of any underlying mortgage in determining the "contract price" in the denominator, since the buyer neither "assumed" the underlying mortgage nor took "subject" to it—the only circumstances set forth in the regulations for any such extraordinary reduction.

The *Stonecrest* holding that the regulations therein did not apply to wraparound sales was thus based primarily on the ground that those regulations were, by their very own terms, limited in application to sales in which "the property is merely taken subject to the mortgage or * * * the mortgage is assumed by the purchaser". Sec. 1.453-4(c), Income Tax Regs. By excluding wraparound sales from the province of the regulations governing "subject to" and "assumed" sales, the Court in effect recognized that the wraparound mortgage, in the context of installment sales, was sufficiently different from the other two categories of mortgages as to require different tax treatment.

In holding that the regulations did not apply and in formulating its own interpretation of the proper application of the section to wraparound mortgages, the Court recog-

nized that the regulations applying to "subject to" and "assumed" sales were carefully tailored to the specific circumstances presented in the "subject to" and "assumed" situations. Those specific circumstances were that, in those types of sales, the entire sales price would not be paid directly to the seller of the property but instead would be paid in part to the seller's mortgagee in satisfaction of the underlying mortgage. The regulations increased the proportion to be used to tax gain by reducing the contract price by the underlying mortgages because, in the context of "subject to" and "assumed" sales, if they did not, they would tax too small a proportion of each payment. Cf. *Burnet v. S.&L. Bldg. Corp.*, 288 U.S. 406 (1933). However, if that adjusted proportion were applied to wraparound sales in which the full price was paid directly to the seller, too much gain would be recognized too soon. Consequently, this Court in *Stonecrest* found that the regulations mandating use of the larger fraction or proportion were "not intended to apply to every sale of mortgaged property but only to those situations where only part of the total selling price would be paid directly to the seller by the purchaser, the remaining part being paid by the buyer directly to the mortgagee." *Estate of Lamberth v. Commissioner*, 31 T.C. 302, 315 (1958).

To adjust for the diversion of a portion of the sales price from the seller to his mortgagee, and the resulting receipt by the seller of smaller payments, the regulations reduced the contract price in the denominator of the proportion and thereby increased that proportion used to tax a portion of each payment as gain. The denominator, or contract price, was reduced by the underlying mortgage to the extent that such mortgage did not exceed the seller's basis in the property sold.[7] Only by so adjusting the proportion used to tax each installment payment as gain by that much of the sales price that would not be paid to the seller would the regulations reach "the entire profit on the sale". *Stonecrest Corp. v. Commissioner*, 24 T.C. at 665. See *Estate of Lamberth v. Commissioner*, 31 T.C. at 315. A proportion

---

[7]To the extent that the amount of the mortgage did exceed the seller's basis, such excess was regarded as having been received by the seller at once where the purchaser assumed the mortgage or took subject to it.

that was not so adjusted would have an overly large denominator and would accordingly result in taxing too small a proportion of each payment.

In *Stonecrest* and the many cases that followed, the Court recognized that this proportion used to tax payments made in the "subject to" and "assumed" situations was not the correct proportion to be used in an installment sale involving a wraparound obligation because in such a wraparound sale, the purchase price would be paid in full directly to the seller. *Estate of Lamberth v. Commissioner*, 31 T.C. 302, 315 (1958).[8] If that larger adjusted proportion were applied to tax as gain a portion of each payment in a wraparound sale, the gain on the sale would be recognized in an accelerated manner that was not contemplated by the statute. See *Hunt v. Commissioner*, 80 T.C. 1126, 1144 (1983); *Estate of Lamberth v. Commissioner*, 31 T.C. at 318. In the case of a wraparound sale, "the entire profit on the sale" would be reached without any adjustment of the proportion through reduction of the contract price in the denominator. Consequently, the proportion applied in *Stonecrest* to wraparound sales was the smaller or unadjusted proportion in which the denominator was not reduced by the underlying mortgages.

Since 1955, when this Court found in *Stonecrest* that the installment sales regulations did not cover the wraparound variation, we have been allowing the recognition of gain in such wraparound sales according to our understanding of

---

[8]As a consequence of the *Stonecrest* decision, the focus of the cases that followed in this area was the determination of whether the sale before the Court constituted either an assumption of a mortgage or a sale subject to a mortgage or whether it constituted a true wraparound mortgage. If it was found to be the former, the proportion adjusted by reducing the total contract price in the denominator by the underlying mortgage would be used, and if found to be the latter, the unadjusted proportion would be used. In addition, under the "subject to" and "assumed" regulations the payments received in the first year would include the seller's basis in excess of the underlying mortgages. The substance of the transaction, and not its form, would govern the determination. *Goodman v. Commissioner*, 74 T.C. 684, 712 (1980), affd. without published opinion 673 F.2d 1332 (7th Cir. 1981); *Voight v. Commissioner*, 68 T.C. 99, 114 (1977), affd. per curiam 614 F.2d 94 (5th Cir. 1980). A transaction presented as a wraparound would not be taxed as such if the purchaser was, in substance, required to discharge the underlying mortgage or the seller had so little control of the proceeds that he could be said to be required to use them to service the underlying mortgage. In the latter case, the seller would be merely acting as a conduit for the mortgagee. *Goodman v. Commissioner, supra; Voight v. Commissioner, supra; Waldrep v. Commissioner*, 52 T.C. 640 (1969), affd. per curiam 428 F.2d 1216 (5th Cir. 1970); *Erfurth v. Commissioner*, T.C. Memo. 1987-232. There is no question here that the wraparound sales are wraparound in substance, as well as in form.

the statutory mandate. Our conclusion that wraparound sales are to be taxed under their own distinct method is by now well settled and generally accepted by those courts that have been faced with this issue.[9] In addition, both the distinction between wraparound and other kinds of financing, and the method of recognizing gain applied to wraparound sales have had at least the tacit approval of Congress. Since *Stonecrest* was decided in 1955, section 453 has been modified on numerous occasions,[10] but no change has been made either to the critical governing language of section 453(c) which sets the proportion by which payments on installment sales are to be recognized as gain or to the treatment under this proportion of wraparound mortgages received in an installment sale. In 1980, the Committee reports accompanying the Installment Sales Revision Act specifically noted the *Stonecrest* case, yet even then no change was made reversing the treatment of wraparound sales established in *Stonecrest*.[11] H. Rept. 96-1042, at 7 (1980); S. Rept. 96-1000, at 9 (1980), 1980-2 C.B. 494, 498.

Nonetheless, the Treasury in 1981 issued the temporary regulations before us now, which call for treatment of wraparound installment sales that is radically different from what is set out in *Stonecrest*. To justify its doing so, the

---

[9]The distinction first set out in *Stonecrest* has been followed consistently. See *Republic Petroleum Corp. v. United States*, 613 F.2d 518 (5th Cir. 1980), affg. 397 F. Supp. 900 (E.D. La. 1975); *Hunt v. Commissioner*, 80 T.C. 1126 (1983); *Goodman v. Commissioner*, 74 T.C. 684 (1980), affd. without published opinion 673 F.2d 1332 (7th Cir. 1981); *Maddox v. Commissioner*, 69 T.C. 854 (1978); *Voight v. Commissioner*, 68 T.C. 99 (1977), affd. per curiam 614 F.2d 94 (5th Cir. 1980); *Waldrep v. Commissioner*, 52 T.C. 640 (1969), affd. per curiam 428 F.2d 1216 (5th Cir. 1970); *United Pacific Corp. v. Commissioner*, 39 T.C. 721 (1963); *Estate of Lamberth v. Commissioner*, 31 T.C. 302 (1958); *Stonecrest Corp. v. Commissioner*, 24 T.C. 655 (1955); *Erfurth v. Commissioner*, T.C. Memo. 1987-232.

Additionally, when the mortgages were found to be true wraparound mortgages the taxpayer has not been required to exclude the underlying mortgage from the total contract price. *Hunt v. Commissioner*, *supra*; *United Pacific Corp. v. Commissioner*, *supra*; *Estate of Lamberth v. Commissioner*, *supra*.

[10]After *Stonecrest*, in addition to various technical amendments in these and other acts, substantive amendments to sec. 453 were made in the following acts: Act of August 31, 1964, Pub. L. 88-539; Act of November 13, 1966, Pub. L. 89-809; Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 608; Tax Reform Act of 1976, Pub. L. 94-445, 90 Stat. 1838. Thereafter, in the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, the entire section was repealed and replaced by a new sec. 453 containing the same proportion for taxing gain.

[11]The change made was to revoke the provision previously in sec. 453(b)(2) that limited the use of the installment method to sales in which the payments received in the taxable year of the sale did not exceed 30 percent of the selling price. The *Stonecrest* case was noted in this connection because the determination of whether a sale involved a wraparound mortgage as opposed to an "assumed" or "subject to" mortgage had implications for whether basis in excess of mortgage would be treated as a payment in the year of sale.

Treasury purported to rely upon the newly enacted Installment Sales Revision Act of 1980, which, however, as we pointed out above, made no change whatever in the critical language of section 453 that governs the present case. The temporary regulations do not attempt to tax the gain on wraparound sales by applying the adjusted proportion used in "subject to" and "assumed" sales to the full payment price paid to the seller in wraparound sales. This treatment was rejected in *Stonecrest* and has not been adopted in the temporary regulations. Instead, the highly complex temporary regulations attempt to tax the gain on wraparound sales at the rate such gain would be recognized if the adjusted proportion were used but applied only to that part of the sales price that would be paid to the seller (i.e., that in excess of the underlying mortgage) if the sales were made "subject to" a mortgage or involved an "assumed" mortgage.

The method by which this goal is accomplished is virtually incomprehensible from the words of the regulation, set forth in the margin.[12] The regulation introduces a new concept—the basis of the installment obligation as distinguished from the seller's basis in the property itself— resulting in two different proportions required to be applied to payments made, neither of which is clearly set out in the regulation. Further, there is some confusion as to precisely which payments are to be subject to which proportion.[13] It

---

[12]Sec. 15A.453-1(b)(3)(ii), Temporary Income Tax Regs. provides in relevant part as follows:

(ii) * * * A "wrap-around mortgage" means an arrangement in which the buyer initially does not assume and purportedly does not take subject to part or all of the mortgage or other indebtedness encumbering the property ("wrapped indebtedness") and, instead, the buyer issues to the seller an installment obligation the principal amount of which reflects such wrapped indebtedness. Ordinarily, the seller will use payments received on the installment obligation to service the wrapped indebtedness. The wrapped indebtedness shall be deemed to have been taken subject to even though title to the property has not passed in the year of sale and even though the seller remains liable for payments on the wrapped indebtedness. In the hands of the seller, the wrap-around installment obligation shall have a basis equal to the seller's basis in the property which was the subject of the installment sale, increased by the amount of gain recognized in the year of sale, and decreased by the amount of cash and the fair market value of other nonqualifying property received in the year of sale. For purposes of this (ii), the amount of any indebtedness assumed or taken subject to by the buyer (other than wrapped indebtedness) is to be treated as cash received by the seller in the year of sale. Therefore, except as otherwise required by section 483 or 1232, the gross profit ratio with respect to the wrap-around installment obligation is a fraction, the numerator of which is the face value of the obligation less the taxpayer's basis in the obligation and the denominator of which is the face value of the obligation.

[13]The Government itself seems to be confused on this point. The examination report on which the Commissioner's determination was based applied the first proportion to all

is only from an examination of the involved examples (5) and (6) accompanying the regulation that its basic operation can be understood, but even the examples do not clarify the ambiguity surrounding the application of the proportions to specific payments.[14] The examples do reveal that the regulation seeks to reach the gain on payments received through the use of two proportions. The first proportion to be used is the adjusted proportion generally used in the "subject to" and "assumed" situations, the one that was disapproved in *Stonecrest* when applied to wraparound sales. As previously noted, that proportion is adjusted through a reduction of the denominator to tax a larger proportion of each payment as gain. Under the temporary

---

payments received in the year of sale. However, on brief the Government interprets the regulation to say that only those payments in the first year that are not payments on the installment obligation (such as the downpayment) are treated under the first proportion. While the former interpretation is more consistent with the language of the regulation, only the latter interpretation carries out its apparently intended effect. In any event, our conclusion as to the validity of the regulation would be the same under either interpretation.

[14]Examples (5) and (6) read as follows:

*Example (5).* G sells to H Blackacre, which is encumbered by a first mortgage with a principal amount of $500,000 and a second mortgage with a principal amount of $400,000, for a selling price of $2 million. G's basis in Blackacre is $700,000. Under the agreement between G and H passage of title is deferred and H does not assume and purportedly does not take subject to either mortgage in the year of sale. H pays G $200,000 in cash and issues a wrap-around mortgage note with a principal amount of $1,800,000 bearing adequate stated interest. H is deemed to have acquired Blackacre subject to the first and second mortgages (wrapped indebtedness) totalling $900,000. The contract price is $1,300,000 (selling price of $2 million less $700,000 mortgages within the seller's basis assumed or taken subject to). Gross profit is also $1,300,000 (selling price of $2 million less $700,000 basis.) Accordingly in the year of sale, the gross profit ratio is 1 ($1,300,000/$1,300,000). Payment in the year of sale is $400,000 ($200,000 cash received plus $200,000 mortgage in excess of basis ($900,000 – $700,000)). Therefore, G recognizes $400,000 gain in the year of sale ($400,000 x 1). In the hands of G the wrap-around installment obligation has a basis of $900,000, equal to G's basis in Blackacre ($700,000) increased by the gain recognized by G in the year of sale ($400,000) reduced by the cash received by G in the year of sale ($200,000). G's gross profit with respect to the note is $900,000 ($1,800,000 face amount less $900,000 basis in the note) and G's contract price with respect to the note is its face amount of $1,800,000. Therefore, the gross profit ratio with respect to the note is ½ ($900,000/$1,800,000).

*Example (6).* The facts are the same as example (5) except that under the terms of the agreement H assumes the $500,000 first mortgage on Blackacre. H does not assume and purportedly does not take subject to the $400,000 second mortgage on Blackacre. The wrap-around installment obligation issued by H to G has a face amount of $1,300,000. The tax results in the year of sale to G are the same as example (5) ($400,000 payment received and gain recognized). In the hands of G, basis in the wrap-around installment obligation is $400,000 ($700,000 basis in Blackacre plus $400,000 gain recognized in the year of sale minus $700,000 ($200,000 cash received and $500,000 treated as cash received as a result of H's assumption of the first mortgage)). G's gross profit with respect to the note is $900,000 ($1,300,000 face amount of the wrap-around installment obligation less $400,000 basis in that note) and G's contract price with respect to the note is its face value of $1,300,000. Therefore, the gross profit ratio with respect to the note is $9/13$ ($900,000/$1,300,000).

regulation, this adjusted proportion is applied to payments made in the year of sale.[15]

For payments received on the installment obligation, a separate proportion is applied. That proportion is the adjusted proportion used in the first year, but its numerator (i.e., the gross profit) contains an adjusted basis that takes into account the gain recognized and payments received in the year of sale. The second proportion is smaller than the first, and it serves only to spread the remaining gain on the sale over the remaining payments.

The result of the use of these two ratios, according to the Government, is that the gain on an installment sale financed through a wraparound arrangement is taxed at the same rate as that on an installment sale financed by taking "subject to" or "assuming" an existing mortgage. This is clearly true in the simplest of cases, where no payment on the installment obligation is made in the year of sale. In that situation, the result could have been achieved alternatively by the use of one proportion (the adjusted proportion) and application of that proportion only to the payments that would have been received had the sale been made "subject to" the mortgage.

However, the use of the two ratios is inexorably required by the regulation. Its effect is unreasonable when viewed in light of "the plain language of the statute, its origin and its purpose." *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477 (1979). First, the language of section 453(c) (I.R.C. 1954), clearly speaks in terms of only a single proportion, and Congress has given no indication that the use of more than one proportion is acceptable in this circumstance.[16] We have previously noted that it is the purpose of section 453 "that a constant proportion, determined by a fixed ratio of gross profit to

[15]The payments involved in this case are all payments made in the year of sale—payments on the installment obligation as well as the downpayments. Despite its interpretation of the regulation on brief (see note 13 *supra*), the Government argues for the treatment of all those payments under this first proportion.

[16]To be sure, Congress has approved regulations using more than one proportion in the context of installment sales in which the gross profit or total contract price cannot, at first, be readily ascertained. H. Rept. 96-1042, at 19-20 (1980); S. Rept. 96-1000, at 22-23 (1980), 1980-2 C.B. 494, 506. However, no such exceptional circumstances are present in this case to give any basis for a conclusion that Congress approved the use of two ratios here. Moreover, the approval was made explicit in that situation. No such approval appears anywhere in respect of the regulation now before us.

total contract price, of each installment payment be returned as income." *Estate of Lamberth v. Commissioner*, 31 T.C. 302, 318 (1958). In addition, the section requires the proportion to be applied to "payments received". While there can be no doubt that in wraparound sales the full payment price is actually received by the seller, the temporary regulations have the effect of treating a portion of the payment price as not so received.

Even more important than the use of one ratio or the application of the proportion to payments received, is that the regulation comport with the purpose of the installment method, which is to allow the recognition of gain to be spread "over the period during which payments of the sales price are received". H. Rept. 96-1042, at 5 (1980); S. Rept. 96-1000, at 7 (1980), 1980-2 C.B. 494, 497. The temporary regulations require gain to be artificially accelerated into the first year of a wraparound sale, regardless of the rate at which payments are received, solely because in the "subject to" and "assumed" situations, such a pattern of gain recognition would occur. However, in the "assumed" and "subject to" situations, any disproportionate gain that results in the year of sale does so because a disproportionate level of payments has been received in that year.[17]

As described earlier, in the "assumed" and "subject to" sales, a larger adjusted proportion is used to tax gain as payments are received. This larger proportion is used because smaller payments are received by the seller—the balance of the payments are made directly to the seller's mortgagee. Since any downpayment is paid in full directly to the seller, the larger adjusted proportion used in order to compensate for the diversion of payments to the mortgagee serves in connection with a downpayment made directly to the seller, to tax the same large proportion of that downpayment (and the mortgage in excess of basis) as gain. This often results in a large recognition of gain in the first year. Although it is true that a disproportionate amount of gain may also be realized in the first year in a wraparound

---

[17]Under a provision of the regulations applying to "subject to" and "assumed" sales that was upheld in *Burnet v. S.&L. Bldg. Corp.*, 288 U.S. 406 (1933), the seller's mortgage in excess of basis is treated as a payment in the year of sale. While a similar provision applying to wraparound sales would seem to be equally reasonable, we express no opinion on this point since no sales in which the seller's mortgage is in excess of basis are involved in this case.

sale by reason of a downpayment, the vice in the temporary regulations is that, through the use of the first ratio, an even greater disproportionate amount of gain subject to tax is allocated to the first year.

The larger recognition of gain in the year of sale is reasonable in the "subject to" and "assumed" situations, because in those types of sales, it reflects the fact that more payments are received by the seller in that year. Respondent asserts that this pattern of gain recognition is also reasonable in a wraparound sale because in such a sale "as a practical matter, the seller is basically a conduit for the portion of the buyer's payments which go to the senior lienor." The Government attempts to justify the use of the two ratios in the temporary regulations to disproportionately recognize gain on the payments actually received by the seller in a wraparound sale by arguing that, in substance, the payments are really received in wraparound sales at the same rate they are received in sales "subject to" a mortgage. We do not agree that the payments are received at the same rate in the two kinds of sales and we find that as a result of requiring the use of the two specified ratios, the temporary regulations are unreasonable in that they do not call for the recognition of gain at a constant rate in proportion to the receipt of payments by the seller.

In the 30 years since *Stonecrest* we have identified wraparound sales, in part, by the fact that in those sales the purchase price is paid in full directly to the seller. It is true that in wraparound sales the seller may service the underlying mortgage out of the payments received from the buyer, but he is not obligated to do so and, instead, is free to discharge that mortgage however he chooses. The fact that he may normally choose to use the sales proceeds to service the underlying obligation does not justify the Commissioner's treating those proceeds as not, in fact, received by the seller. The seller in a wraparound sale receives neither "current payment nor the practical benefit of current payment of the underlying debt." *Hunt v. Commissioner*, 80 T.C. 1126, 1142-1143 (1983). He receives, instead, the full payment price directly. If the seller did not receive unrestricted use of the full payment price directly

but was merely a conduit for the mortgagee, we would not treat that sale under the method of taxing gain prescribed for wraparound sales, but would apply the "subject to" and "assumed" regulations. Where the funds have in fact been received by the seller without restriction on their use, we have for more than 30 years treated those funds as "payments received" by the seller and have required the gain to be recognized as a proportion of those "payments received". These are the words of the statute and they must be given effect.

The essence of the installment method is that gain is to be recognized as payments are received—the more payments received, the more gain recognized. While we appreciate that Congress gave the Secretary wide discretion to regulate the recognition of gain in installment sales, we cannot approve an exercise of discretion to reach a result contrary to the basic objective of the statute by requiring the recognition of additional gain beyond what is proportionately reflected in the payments received during the first year.

The Government's attempt to support the temporary regulations under attack is made even more egregious by its use of the Installment Sales Revision Act of 1980 to justify the changes made by the temporary regulations. That act did not revise the treatment of wraparound installment sales in respect of the issue before us. Instead, its purpose was to simplify the taxation of installment sales by "making structural improvements to existing law" and, further, to remove those limitations (particularly, the 30-percent requirement) on the use of the installment method that "operated as a trap for the unwary". H. Rept. 96-1042, *supra* at 5-6, 8; S. Rept. 96-1000, *supra* at 7-8, 10-11, 1980-2 C.B. at 497-499. The tortuously complex temporary regulations promulgated under the pretext of interpreting the changes made in the 1980 Act can in no way be considered compatible with the goals of that act. Neither are they consistent with that part of the installment method—the proportion used to tax payments received—that was retained in the Installment Sales Revision Act of 1980.

Reluctant as we are to do so, we hold that the temporary regulations are inconsistent with the statute and therefore invalid.

*Decision will be entered for the petitioner.*

Reviewed by the Court.

STERRETT, CHABOT, NIMS, PARKER, WHITAKER, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.*, agree with this opinion.

KÖRNER, *J.*, did not participate in the consideration of this case.