ROBERT E. KLINE and MAUREEN KLINE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kline v. Commissioner
Docket No. 31916-86
United States Tax Court
T.C. Memo 1989-317; 1989 Tax Ct. Memo LEXIS 317; 57 T.C.M. (CCH) 822; T.C.M. (RIA) 89317; June 28, 1989
James W. Zeeb, for the petitioners. J. Robert Cuatto and Dennis C. DeBerry, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency of $ 17,310.16 in petitioners' joint Federal income tax for *318 the calendar year 1981. After concessions, the remaining issue we must decide is whether, for purposes of computing the gross profit ratio under section 453(c), certain property purchased in part with a wraparound mortgage was in substance taken subject to an underlying mortgage. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during 1981. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners timely filed their joint Federal income tax return for the calendar year 1981 with the Internal Revenue Service Center in Ogden, Utah. At the time the petition in this case was filed, petitioners resided in Tucson, Arizona. During 1981 and all times relevant to this case, petitioners were partners in an Arizona general partnership, known as ACF Investments (ACF). On February 23, 1979, a joint venture was formed between ACF, Arcadia-Broadway Associates and Mr. Lew S. McGinnis, known as Broadway Centre (Broadway). Broadway was formed for the purpose of constructing and leasing an office building. *319 Broadway financed the construction of the office building with a non-recourse note payable to the Arizona Bank in an original principal amount of $ 5,250,000 (First-Lien Note). On June 15, 1981, Broadway agreed to sell the constructed office building to Shearson-Murray Real Estate Fund V, Limited (Shearson), at a stated price of $ 9,750,000 (Purchase Agreement). The terms of the sale provided for the payment of $ 4,500,000 in cash or cashier's check at closing, and the execution and delivery by Shearson of a $ 5,250,000 non-recourse wraparound promissory note secured by a wraparound deed of trust. Article II, paragraph (b) of the Purchase Agreement states in part: the Wrap-Around Note shall include the unpaid principal balance of an existing first-lien note * * * dated June 7, 1979, executed by Seller and payable to the order of the Arizona Bank in the original principal amount of FIVE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($ 5,250,000.00) but without the Purchaser assuming any liability for the obligations under the First-Lien Note. Prior to Shearson's purchase of the office building, the First-Lien Note was assigned to Pacific Mutual Life Insurance Company (Pacific *320 Mutual). Pacific Mutual's approval of the sale was required, and Broadway and Shearson each reserved the right to terminate the Purchase Agreement in the event either party objected to any material change in terms required by Pacific Mutual. The sale was closed on August 31, 1981, and title to the office building was transferred to Shearson. On this date, the principal balance due on the First-Lien Note was $ 5,182,811. The parties have stipulated that Broadway is entitled to report gain recognized on the sale of the office building as an installment sale under section 453. Broadway's adjusted basis in the office building as of the date of sale was $ 5,282,329. Broadway incurred commissions and other expenses in connection with the sale of $ 125,836. Accordingly, Broadway's "gross profit" for purposes of section 453(c) was $ 4,341,835. A wraparound note dated August 31, 1981 was prepared in accordance with the Purchase Agreement, signed and delivered to Broadway at closing (Wraparound Note). Specific terms of the Wraparound Note include that: (1) Interest would accrue at the same rate and on the same basis as the First-Lien Note; (2) monthly installments of principal and *321 interest would be paid in amounts equal to the corresponding monthly installments under the First-Lien Note; (3) the maturity date would be the same as under the First-Lien Note; (4) the liability of Shearson or any of its partners in the event of default was limited to their interests in the office building (i.e., the Wraparound Note was non-recourse); (5) Shearson could not prepay (in whole or in part) prior to the time prepayments were permitted under the First-Lien Note without Broadway's consent, and then only if Shearson paid all prepayment penalties required under the First-Lien Note; and (6) Broadway could not prepay, alter, renew, rearrange, restructure, refinance or increase the First-Lien Note without the consent of Shearson. The Wraparound Note also stated that Shearson "has not assumed the obligations under the First-Lien Note or the First-Lien Deed of Trust and nothing contained herein shall be construed to the contrary." Even though the monthly payments on the First-Lien Note and the Wraparound Note were identical, Broadway realized net interest income as an economic benefit in using wraparound financing. Both promissory notes used amortization schedules prepared *322 under the actuarial interest method. Thus, the portion of each monthly installment representing the payment of interest decreased over the term of the notes. Broadway was already over two years into the amortization of the First-Lien Note at the time the Wraparound Note was cast. Accordingly, the timing difference between amortization schedules resulted in an excess of interest income realized by Broadway on the Wraparound Note over over interest expense paid or incurred on the First-Lien Note. The Wraparound Note states that monthly payments "shall be made to Commonwealth Land Title Agency of Tucson, Inc. [Commonwealth], an Arizona corporation * * * , as collection agent, in accordance with the terms of that Collection Agreement of even date herewith among Maker [i.e., Shearson], Broadway Centre and * * * [Commonwealth]." The Collection Agreement states that Commonwealth "is authorized to disburse the entire monthly payment to * * * Pacific Mutual * * * [and] [u]pon satisfaction of [the] Pacific Mutual Loan * * * , the remaining balance to be disbursed to * * * Broadway * * *." The Collection Agreement states that Commonwealth "acts only in the capacity of an escrow *323 agent and shall be liable only for monies actually received for applications to this agreement." Commonwealth reserved the right to terminate the Collection Agreement upon 30 days' written notice. In the event of Broadway's default under the First-Lien Note or First-Lien Deed of Trust, the Wraparound Note states that: Maker [i.e., Shearson] has the right, but is not obligated, to cure such default and any sums paid to effect such cure shall entitle Maker to receive a credit on the [Wraparound] Note (to be applied against any amounts under the [Wraparound] Note Maker may elect) in an amount equal to 115% of amounts so paid; provided, however, that Maker, by effecting any such cure, shall not be deemed to have assumed any of the obligations under the First-Lien Note or the First-Lien Deed of Trust. [Emphasis in original.] Commonwealth was also the trustee under the wraparound deed of trust securing the Wraparound Note (Wraparound Deed of Trust). Under the Wraparound Deed of Trust, the filing of a petition in bankruptcy by or against Shearson was an event of default. In 1985, Shearson filed a petition under Chapter 11 of the Federal bankruptcy code. Since such time, *324 Broadway has made no payments on the First-Lien Note and Shearson has made no payments on the Wraparound Note. Prior to its bankruptcy, Shearson made required monthly payments on the Wraparound Note to Commonwealth and Commonwealth in turn made the monthly payments on the First-Lien Note to Pacific Mutual. Sometime in 1983, however, Mr. Lew McGinnis moved the collection account to the United Bank without first obtaining the consent of the parties to the Collection Agreement. The collection account was moved back to Commonwealth after only one monthly payment had been missed. OPINION The parties have stipulated that Broadway is entitled to report gain recognized on the sale of the office building as an installment sale under section 453. Section 453(a) provides generally that income from an "installment sale" shall be taken into account in determining taxable income under the "installment method." The term "installment sale" means a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs. Sec. 453(b)(1). *325 The term "installment method" means "a method under which the income recognized for any taxable year from a disposition is that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price." Sec. 453(c). The Wraparound Note provided for payments by Shearson to Broadway beyond the year of sale, 1981. Thus, there was an installment sale under section 453(b)(1). The price of the office building sold from Broadway to Shearson was $ 9,750,000. Broadway's adjusted basis in the office building as of the date of sale was $ 5,282,329. Broadway incurred commissions and other expenses in connection with the sale of $ 125,836. Accordingly, Broadway's "gross profit" was $ 4,341,835, representing the numerator of the fraction spelled out in section 453(c). The dispute in this case centers upon determining the amount of the "total contract price," which represents the denominator of the gross profit ratio under section 453(c). Respondent argues that although in form Broadway received a wraparound *326 note from Shearson, in substance Shearson took the office building "subject to" the First-Lien Note (and First-Lien Deed of Trust) payable to Pacific Mutual. Accordingly, respondent contends that the $ 9,750,000 sales price should be reduced by the $ 5,182,811 balance outstanding on the First-Lien Note at the time of sale. In contrast, petitioner essentially argues that we should respect the form of the wraparound financing, and that the total contract price is thus the sales price of the office building. In computing the total contract price, the sales price of property is to be reduced by the amount of any mortgage "assumed" or taken "subject to" by a buyer, to the extent it does not exceed the seller's basis in the property sold. Stonecrest Corp. v. Commissioner,24 T.C. 659, 665 (1955); sec. 15A.453-1(b)(2)(iii), Temporary Income Tax Regs., 46 Fed. Reg. 10708 (Feb. 4, 1981). In Stonecrest, we explained the customary meanings of "assuming" and taking property "subject to" a mortgage as follows: Taking property subject *327 to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obliged to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property. Where a buyer assumes a mortgage on property, he pays the seller for the latter's redemption interest, and in addition promises the seller to pay off the mortgage debt. The promise of the buyer can ordinarily be enforced by the mortgagee. 5 Tiffany, The Law of Real Property, secs. 1435, 1436 (3d ed. 1939); IV American Law of Property, secs. 16.125, 16.127, 16.128-16.132 (1952). [Stonecrest Corp. v. Commissioner,24 T.C. at 666.] In comparison, a "wraparound mortgage" is an *328 agreement under which the purchaser issues to the seller an installment obligation that includes the amount of an underlying mortgage on the property as the principal amount, and the seller uses the payments under the installment obligation to service the underlying mortgage. The seller remains liable on and continues to service the underlying mortgage. Thus, a distinguishing feature of a wraparound mortgage is that payments are made to the seller, and not to an underlying mortgagee, as is the case where a mortgage is assumed or property is taken subject to a mortgage. In Professional Equities, Inc. v. Commissioner,89 T.C. 165 (1987), we invalidated section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., and reaffirmed the long standing principle that under a true wraparound mortgage, the sales price of property is not reduced by the amount of any underlying mortgage in computing the total contract price: Since 1955, when this Court found in Stonecrest that the installment sales regulations [requiring that the sales price of property *329 be reduced by the amount of mortgage assumed or taken subject to] did not cover the wraparound variation, we have been allowing the recognition of gain in such wraparound sales according to our understanding of the statutory mandate. Our conclusion that wraparound sales are to be taxed under their own distinct method is by now well settled and generally accepted by those courts that have been faced with this issue. * * * [Professional Equities, Inc. v. Commissioner,89 T.C. at 173-174.] However, "A transaction presented as a wraparound would not be taxed as such if the purchaser was, in substance, required to discharge the underlying mortgage or the seller had so little control of the proceeds that he could be said to be required to use them to service the underlying mortgage." Professional Equities, Inc. v. Commissioner,89 T.C. at 173 n. 8, citing Goodman v. Commissioner,74 T.C. 684 (1980), affd. without published opinion 673 F.2d 1332 (7th Cir. 1981); Voight v. Commissioner,68 T.C. 99 (1977), affd. per curiam 614 F.2d 94 (5th Cir. 1980); Waltrep v. Commissioner,52 T.C. 640 (1969), *330 affd. per curiam 428 F.2d 1216 (5th Cir. 1970), and Erfurth v. Commissioner,T.C. Memo. 1987-232. "[I]t is necessary to consider all the facts and the import of all the documents executed by the parties in order to determine whether all the elements present in * * * the taking of property subject to a mortgage * * * are present." Goodman v. Commissioner,74 T.C. at 713. In Goodman v. Commissioner, supra, payments on a purported wraparound mortgage were required to be made to a specified bank as collection agent. As collection agent, the bank deducted from each payment received the amount needed to service the underlying mortgage and was required to remit these amounts to the underlying mortgagee. We held that the bank was a conduit for payments directly (i.e., not through the seller) from the purchasers to the underlying mortgagee, and, accordingly, the buyers were treated as having in substance taken the property subject to the underlying mortgage. Goodman v. Commissioner, supra.
Petitioners argue that Goodman "is materially distinguishable from the case at hand on its facts and is not *331 the controlling precedent in this case." We disagree. Petitioners argue that the collection account in Goodman was established in order to protect the purchasers, while in this case it was established to protect the sellers (Broadway). Two participants in the Broadway joint venture (Messrs. Donald Semro and Thomas Warne) testified that a collection account was used at their behest, in order to ensure that payments on the Wraparound Note remained out of the control of Mr. Lew McGinnis, whom they considered to be financially irresponsible. Petitioners reason that since the Collection Agreement was motivated by a valid business purpose of the sellers, and not tax avoidance, wraparound status should not be adversely affected. In determining the substance of the subject transaction, we are more concerned about the nature and effect of the Collection Agreement itself than the reasons why it was established. In any event, Mr. Semro testified that Mr. McGinnis also wanted to use a collection account. Further, we cannot blind ourselves to the obvious benefit to the purchaser (Shearson) in using a collection account to provide assurance that payments made on the Wraparound Note *332 would in turn be used to service the First-Lien Note. Accordingly, we find this aspect of petitioners' argument unpersuasive. Petitioners also contend that the collection agent in Goodman was obligated to remit collected funds to the underlying mortgagee, while in this case the Collection Agreement states that Commonwealth is "authorized to disburse" payments to Pacific Mutual. (Emphasis added.) We fail to see the significance of this distinction. While Commonwealth was expressly authorized to disburse payments to Pacific Mutual, as escrow agent it was also obligated to do so. Commonwealth's function was ministerial in nature; it did not have the discretion to decide whether to make payments to Pacific Mutual. Rather, the Collection Agreement provided that Broadway would not receive the remaining balance in the collection account until the First-Lien Note was satisfied. Further, petitioners have failed to show that Broadway could unilaterally terminate the Collection Agreement without the consent of Shearson. We are convinced that Broadway gave up sufficient control over the proceeds of the Wraparound Note that it was in substance required to use them to service *333 the First-Lien Note. See Professional Equities, Inc. v. Commissioner,89 T.C. at 173 n. 8. Accordingly, we hold for respondent. To reflect the foregoing and concessions, Decision will be entered under Rule 155.